STATE OF NORTH CAROLINA v. WESLEY TOBY SMITH, JR.

No. 607A02

(Filed 5 December 2003)

### 1. Evidence— hearsay—state of mind exception

The trial court did not err in a capital first-degree murder prosecution by admitting a hearsay statement of the victim at trial regarding a blue van under the N.C.G.S. § 8C-1, Rule 803(3) state of mind exception, because: (1) the testimony regarding the blue van made four days prior to the victim's death served to support the victim's assertion that it was spooky at home alone during the day and tended to show her state of mind at the time of the conversation with her mother; (2) the statement about the blue van, along with an earlier statement that defendant gave the victim the creeps, supported the victim's intention to tell defendant to stay away and was relevant to show a potential confrontation; and (3) even assuming the testimony was inadmissible based on the fact that defendant drove a black and burgundy colored van and the only link ever made between defendant and the blue van was made by defendant's counsel, defendant has not shown that the error was prejudicial.

### 2. Evidence— nonexpert testimony—effects of Valium

The trial court did not err in a capital first-degree murder prosecution by allowing the testimony of a nurse regarding the effects of ten milligrams of Valium, because: (1) the testimony was admissible under N.C.G.S. § 8C-1, Rule 701 as a nonexpert's opinion based on reasonable perceptions while working as a nurse over a number of years; and (2) her testimony was admissible under Rule 701 since the testimony was helpful in the determination of a fact in issue concerning whether defendant was so impaired when he killed the victim that he could not have killed with premeditation and deliberation.

### 3. Evidence— testimony—defendant carried pocketknife

The trial court did not commit prejudicial error in a capital first-degree murder prosecution by admitting testimony that defendant sometimes carried a pocketknife, because: (1) defendant admitted to stabbing the victim with a knife, the murder weapon was not found, and evidence was presented that defendant carried different knives at different times; and (2) defendant

cannot establish that the outcome of his trial would have been any different had the testimony regarding the knife been excluded.

### 4. Criminal Law— prosecutor's argument—crime scene

The trial court did not abuse its discretion in a capital first-degree murder prosecution by failing to intervene ex mero motu during the prosecutor's closing argument regarding the crime scene, because: (1) prosecutors may create a scenario of the crime committed that is reasonably inferable from the evidence in the record, and the prosecutor's inferences from the evidence presented were not so tenuous that the trial court needed to intervene; and (2) the prosecutor informed the jury that his version was just one interpretation of the evidence presented at trial.

### 5. Homicide— first-degree murder—motion to dismiss—sufficiency of evidence

The trial court did not err by denying defendant's motion to dismiss the charge of first-degree premeditated murder, because: (1) defendant confessed to killing the victim by stabbing her repeatedly; (2) although the victim's request to stay away was presumably the trigger for defendant's actions, telling a casual acquaintance to stay away is not sufficient provocation to compel a killing by stabbing or even a rage; (3) defendant told four different stories of how he injured his hands in an attempt to avoid being linked to the crime; (4) defendant first denied involvement and attempted to divert suspicion; and (5) the victim was stabbed and cut approximately sixty times, and defendant admitted that he repeatedly stabbed the victim even as she fell to the floor and tried to crawl away.

### 6. Criminal Law— capital sentencing—prosecutor's argument—defendant's failure to show remorse—not comment on failure to testify

The trial court did not err in a capital sentencing proceeding by failing to intervene ex mero motu during the State's closing argument allegedly commenting on defendant's failure to testify, because: (1) the prosecutor was commenting on defendant's demeanor, and the jury can consider the demeanor of defendant in making its sentencing decision; and (2) the prosecutor's statements were not of such a character that the jury would take the statements to be a reference to defendant's failure to testify.

**7. Constitutional Law— right to testify—trial court inquiry**

The trial court did not err by failing to inquire whether defendant wished to testify at his capital sentencing proceeding, because: (1) our Supreme Court has never required trial courts to inform a defendant of his right to testify or to make an inquiry on the record regarding his waiver of the right to testify; (2) absent a defendant's indication that he wished to testify, it cannot be said that the trial court denied defendant his right; and (3) after all evidence was presented at the guilt-innocence phase of the trial, defense counsel made it clear that defendant wished to waive the right to testify on his own behalf.

**8. Homicide— first-degree murder—failure to allege aggravating circumstances in indictment**

The trial court had jurisdiction to enter a death sentence against defendant for first-degree murder even though the indictment did not allege any aggravating circumstances.

**9. Homicide— first-degree murder—short-form indictment—constitutionality**

The short-form indictment used to charge defendant with first-degree murder was constitutional.

**10. Constitutional Law— effective assistance of counsel—failure to move for dismissal of charges**

A defendant in a first-degree murder case was not deprived of the effective assistance of counsel even though his counsel failed to move for dismissal of the charges based on lack of jurisdiction, because: (1) the indictment charging defendant was proper, and the trial court had jurisdiction to convict defendant of first-degree murder and to sentence him to death; and (2) defense counsel's failure to object to a legally sufficient indictment was not a deficiency in performance.

**11. Sentencing— aggravating circumstances—murder especially heinous, atrocious, or cruel**

The evidence in a capital first-degree murder case supported the jury's finding of the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel, because: (1) the victim was stabbed approximately sixty times in her own home; (2) defendant continued to stab the victim even as she fell to the ground and attempted to crawl away; and (3) it took approximately ten minutes for the victim to die.

**STATE v. SMITH**

[357 N.C. 604 (2003)]

## 12. Sentencing— capital—death penalty—proportionate

The trial court did not err in a first-degree murder case by sentencing defendant to the death penalty, because: (1) defendant was found guilty on the basis of premeditation and deliberation; (2) the victim was murdered in her own home, a factor which shocks the conscience; and (3) the jury found the N.C.G.S. § 15A-2000(e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered 29 May 2002 by Judge Charles C. Lamm, Jr., in Superior Court, Rowan County, upon a jury verdict finding defendant guilty of first-degree murder. Heard in the Supreme Court 8 September 2003.

*Roy Cooper, Attorney General, by Joan M. Cunningham, Assistant Attorney General, for the State.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellant.*

LAKE, Chief Justice.

On 15 October 2001, defendant was indicted for first-degree murder for the stabbing death of Margaret Leighann Martin. He was tried capitally to a jury at the 6 May 2002 Criminal Session of Superior Court, Rowan County, the Honorable Charles C. Lamm, Jr. presiding. The jury found defendant guilty of first-degree murder, and, following a capital sentencing proceeding, recommended that defendant be sentenced to death. On 29 May 2002, Judge Lamm sentenced defendant accordingly. Defendant appeals his conviction for first-degree murder and his death sentence to this Court as of right.

The evidence at trial tended to show that defendant met the victim's boyfriend, Jason Wagner, while working as a painter at a construction site. Defendant became acquainted with the victim, Margaret Leighann Martin, during her visits to the construction site to see Wagner. Defendant visited the couple at their home several times, occasionally staying even when Wagner was not there.

On two separate occasions, Martin expressed her discomfort about being around defendant. In the summer of 2001, Martin told her mother that she had stopped visiting Wagner at work because defendant "gave her the creeps." On 8 September 2001, Martin told her

mother that she intended to tell defendant to stop visiting her home and to stop associating with Wagner.

On 11 September 2001, Wagner returned home early in the day to check on Martin. Defendant's van was parked in the driveway, and Wagner found defendant and Martin sitting at opposite ends of the couch watching television. Defendant asked Wagner if he had any work available. Wagner replied in the negative and defendant left shortly thereafter.

The following day, Wagner left for work at approximately eight o'clock in the morning. He returned home in the evening to find the front door open. Once inside, Wagner noticed a dining room chair was flipped over, the dishwasher door was open, and there was blood in the kitchen. Wagner ran to the bedroom, where he found Martin lying face down on the floor beside the bed. Wagner checked for a pulse and discovered that Martin was dead. She had been stabbed approximately sixty times in the back, head, and chest areas. Additionally, her throat and neck were cut in several places.

Defendant was first questioned by police on 17 September 2001. At that time, defendant denied any involvement in the victim's murder and consented to giving blood, hair, and fingernail samples. That same day, the police searched defendant's home and property, finding a pair of shoes that were later determined to match prints found in the victim's home. After searching defendant's property, the police asked defendant to return to the sheriff's department for further questioning. Defendant confessed to Martin's murder during his second interview with police and gave a written statement detailing the circumstances of the victim's death. The basic issue for the jury to determine at trial was whether defendant murdered the victim with premeditation and deliberation.

Defendant sets forth several assignments of error in the proceedings. He additionally argues that the sentence of death imposed upon him is disproportionate to the crime. For the reasons that follow, we conclude that defendant's trial and capital sentencing proceeding were free of prejudicial error and that defendant's sentence of death is not disproportionate.

[1] In his first assignment of error, defendant contends that the trial court erred in admitting a hearsay statement of the victim at trial. Martin's mother, Tonia Helms, testified as to a conversation she had with Martin shortly before her death. According to this testimony, the Saturday before Martin died, she told her mother that she intended to

tell defendant to stop coming by the house and to stop associating with Wagner. During the same conversation, Martin told her mother that it was "spooky" at home, alone, during the day, and that sometimes a blue van would come to the end of the road and hesitate before turning around to leave. Defendant objected to the testimony regarding the blue van, but the trial court admitted the testimony pursuant to N.C.G.S. § 8C-1, Rule 803(3).

Defendant contends that Helms' testimony regarding the blue van was not within the Rule 803(3) hearsay exception. Rule 803(3) allows for the admission of

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

N.C.G.S. § 8C-1, Rule 803(3) (2001). Statements that merely recount a factual event are not admissible under Rule 803(3) because such facts can be proven with better evidence, such as the in-court testimony of an eyewitness. *State v. Hardy*, 339 N.C. 207, 229, 451 S.E.2d 600, 612 (1994). However, where such statements "serve . . . to demonstrate the basis for the [victim's] emotions," the statements will be admitted under Rule 803(3). *State v. Gray*, 347 N.C. 143, 173, 491 S.E.2d 538, 550 (1997), *cert. denied*, 523 U.S. 1031, 140 L. Ed. 2d 486 (1998), *and overruled in part on other grounds by State v. Long*, 354 N.C. 534, 557 S.E.2d 89 (2001). Martin told her mother, just prior to relating the story of the blue van, that it was "spooky" at home alone during the day. Martin's statement that it was "spooky" at home alone indicated her general feeling of discomfort about being home alone and was a part of her expressed feeling regarding defendant. The activity of the blue van was a factor contributing to Martin's discomfort. We thus hold that the testimony regarding the blue van served to support Martin's assertion that it was "spooky" at home alone during the day and tended to show her state of mind at the time of the conversation. Ms. Helms' testimony of the statements Martin made four days prior to her death reflects Martin's state of mind and comes within the Rule 803(3) hearsay exception.

Defendant also contends that even if the testimony was admissible under Rule 803(3), the testimony should have been excluded as irrelevant because defendant's van was black and burgundy in color.

We disagree. "[A] victim's state of mind is relevant if it relates directly to circumstances giving rise to a potential confrontation with the defendant." *State v. McLemore*, 343 N.C. 240, 246, 470 S.E.2d 2, 7 (1996). Here, Ms. Helms testified that Martin told her she intended to tell defendant to stop coming to the house. She followed up by stating that it was "spooky" there and that she had seen a blue van come down the road and hesitate before leaving. Martin's statements, along with an earlier statement that defendant gave her "the creeps," support her intent to tell defendant to stay away. The testimony was relevant because it related to Martin's intent to tell defendant to stop coming to the house, giving rise to a potential confrontation.

Even assuming *arguendo* that the testimony regarding the blue van was inadmissible, defendant has not shown that the error was prejudicial to his case. In order to prevail, defendant must show "that a reasonable possibility exists that a different result would have been reached absent the error." *State v. Weeks*, 322 N.C. 152, 170, 367 S.E.2d 895, 906 (1988). The prosecution did not attempt to connect defendant to the blue van or suggest that the driver of the blue van murdered the victim. Testimony from several witnesses established that defendant drove a black and burgundy colored van. The only link ever made between defendant and the blue van was made by defendant's counsel. Given that a relationship between defendant and the blue van was never established, defendant cannot show that a reasonable possibility exists that the outcome would have been different had the testimony been excluded. Therefore, even if the trial court did err in admitting the testimony regarding the blue van, such error was harmless to defendant beyond a reasonable doubt. This assignment of error is overruled.

[2] Defendant next assigns error to the trial court's decision to allow the nonexpert testimony of nurse Leslie Burgess regarding the effects of ten milligrams of Valium. Defendant, in an attempt to negate the *mens rea* required for first-degree murder, argued that he was under the influence of a combination of drugs at the time he murdered the victim and thus was not capable of premeditation and deliberation. In his statement to police, defendant stated that on the morning of the murder, he "took some pills, 2 Valium, ten milligrams, 3 Klonopins, ten milligrams, 2 Xanax, number 10's." Ms. Burgess testified for the State as to the effects of two, ten-milligram Valium on the body.

Ms. Burgess testified that she holds bachelor degrees in preveterinary medicine and in nursing. She has been a registered nurse

since 1995. She has worked in the Intensive Care, Pediatric Intensive Care, and Pediatric Open Heart units of various hospitals. At the time of her encounter with defendant, Ms. Burgess worked in the emergency room of Rowan Regional Medical Center. Ms. Burgess was a highly qualified nurse with years of experience, but she did not have sufficient specialized knowledge, training, or experience necessary to testify as an expert regarding the effects of ten milligrams of Valium. Even though Ms. Burgess could not testify as an expert as to the effects of ten milligrams of Valium and was not so tendered, her testimony was still admissible under N.C.G.S. § 8C-1, Rule 701 as a nonexpert's opinion, based on her reasonable perceptions.

North Carolina Rule of Evidence 701 states:

> If the witness is not testifying as an expert, [her] testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of [her] testimony or the determination of a fact in issue.

N.C.G.S. § 8C-1, Rule 701 (2001).

Ms. Burgess gave extensive testimony as to defendant's physical condition at the time she treated him at the hospital. She testified that his temperature, pulse rate, respiration, blood pressure, and oxygen saturation levels were all in the normal range for a man of his age and size. She additionally testified that his pupils reacted normally to light and he did not appear intoxicated or otherwise impaired. After questioning Ms. Burgess on defendant's condition as she observed him on 12 September 2001, the State went on to ask Ms. Burgess several questions about the effects of Valium on an individual. The following colloquy occurred during a *voir dire* of Ms. Burgess:

> Q. And just say where you worked, if you can recall, in this last twelve years.

> A. At Presbyterian Hospital in Charlotte, I worked in their Intensive Care Unit, and then I worked in the Pediatric Intensive Care Unit. I've worked at MUSC, Medical University of South Carolina in Charleston, South Carolina in the Pediatric Intensive Care Unit, Pediatric Open Heart Unit, and Pediatric Emergency Room, and at Northeast Medical Center in Concord in the Pediatric Intensive Care Unit and Rowan Regional Medical Center in the Emergency Department.

**STATE v. SMITH**

[357 N.C. 604 (2003)]

Q. In the course of your duties, did you see the—did you see Valium prescribed?

A. Yes. I also worked at Carolina Medical in the Emergency Department on a part-time basis.

Q. You saw Valium prescribed for patients that were under your care?

A. That's correct.

Q. And did you personally observe the effects of Valium on—specifically, of taking two, ten milligram Valiums.

A. Of two, ten? Rarely.

Q. Okay.

A. Because that was a high dose.

Q. All right. What would be a typical dose of Valium?

A. Ten—ten milligrams.

Q. One, ten milligrams.

A. That's correct.

Ms. Burgess was then allowed to testify before the jury as to the effects of taking two, ten-milligram Valium. She testified as follows:

Q. Now, Ms. Burgess, I think I was asking you whether, in the course of your duties and training, that you're familiar with the effects of the drug known as Valium?

A. Yes, I am.

. . . .

Q. All right. And, are you familiar with the effects of taking two, ten milligram Valium at the same time would be on a person?

A. Yes, sir. It'd make them lethargic, somewhat disoriented, slow to respond, pupillary response would be sluggish . . . . Movements would be slow, the vital signs would be depressed, meaning the respirations would be low, the blood pressure would be low and the pulse would definitely be low.

Q. Did you find any of these effects on Wesley [Toby] Smith, Jr. when you examined him at 12:15, on September 12th?

A. No, sir.

Q. Do you have an opinion as to how long the effects of taking two, ten milligram Valium would remain—how long the effects would last on the individual that had taken them?

A. The maximum I would say would be six hours, maybe four hours.

Ms. Burgess' testimony regarding the effects of two, ten-milligram Valium was rationally based on her perceptions while working as a nurse over a number of years. She testified that she had seen the effects of Valium on patients in her care. Although Ms. Burgess did acknowledge during *voir dire* that she had rarely seen the effects of two, ten-milligram Valium, the trial court could reasonably infer from her response that she had seen the effects of such a dose at least once. Even if Ms. Burgess had not had personal experience with a patient taking two, ten-milligram Valium, her observations of the effects of a normal dose, along with her observations of the effects of medication in general, were sufficient for her to render a lay opinion as to the effects of two, ten-milligram Valium.

Ms. Burgess' testimony was further admissible as a nonexpert opinion under Rule 701 because the testimony was helpful in the determination of a fact in issue. Ms. Burgess' testimony was helpful to the jury in determining whether defendant was so impaired when he killed the victim that he could not have killed with premeditation and deliberation. Since Ms. Burgess' opinion as to the effects of two, ten-milligram Valium was rationally based on her perceptions while working as a nurse and her testimony was helpful to the jury in determining a fact in issue, the trial court did not err by allowing Ms. Burgess' testimony. This assignment of error is overruled.

[3] Defendant's third assignment of error is that the trial court committed prejudicial error by admitting testimony that defendant sometimes carried a pocketknife. Dr. Kenneth Snell, the pathologist who performed the victim's autopsy, concluded that the murder weapon was a knife with a blade no longer than three inches. The State introduced evidence that defendant had been known to occasionally carry a four-inch knife on his person. Defendant contends that because his pocketknife could not have been the weapon, the testimony that he sometimes carried it was irrelevant and prejudicial.

Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue. "In criminal cases, 'every circumstance that is calculated to throw any light upon the supposed crime is admissi-

ble. The weight of such evidence is for the jury.' " *State v. Lytch*, 142 N.C. App. 576, 580, 544 S.E.2d 570, 573 (2001) (quoting *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965), cert. denied, 384 U.S. 1020, 16 L. Ed. 2d 1044 (1966)). Defendant admitted to stabbing the victim with a knife, yet the murder weapon was never found. The testimony to which defendant objects was relevant because it established that defendant sometimes carried a knife. The particular knife described had a four-inch blade, however, defendant may have carried different knives at different times. Because the weapon used to murder the victim was never found, evidence that defendant carried a knife with him at times had some relevance to the case.

Even assuming *arguendo* that the testimony was not relevant, defendant has the burden of establishing that the trial court's error in allowing the testimony was so prejudicial that a different result would have occurred had the testimony been excluded. *State v. Gappins*, 320 N.C. 64, 68, 357 S.E.2d 654, 657 (1987). Defendant has failed to meet his burden. Defendant argues that the testimony may have led the jury to infer that defendant was a violent man. However, defendant elicited testimony from his own witnesses regarding the various knives he owned and carried. In light of such testimony from his own witnesses, defendant cannot now say that the testimony may have caused the jury to speculate as to his tendencies towards violence. Additionally, it was not necessary for the State to prove that defendant carried a knife the day he murdered the victim. The jury could find defendant guilty based upon his picking up and using a knife found in the home, as defendant stated in his confession. Defendant cannot establish that the outcome of his trial would have been any different had the testimony regarding the knife been excluded. This assignment of error is overruled.

[4] Defendant's fourth assignment of error is that the State's closing argument was unsupported by the evidence and was grossly improper. Defendant failed to object to the prosecutor's closing argument at trial. Therefore, "review is limited to an examination of whether the argument was so grossly improper that the trial [court] abused [its] discretion in failing to intervene *ex mero motu*." *State v. Gladden*, 315 N.C. 398, 417, 340 S.E.2d 673, 685, *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

In his closing argument, the prosecutor told the jury that the crime scene was "absolutely critical" in determining defendant's intent when he murdered the victim. The prosecutor then suggested

STATE v. SMITH

[357 N.C. 604 (2003)]

a scenario of the crime in which defendant first stabbed the victim in the back and in the head. Later, the prosecutor suggested to the jury that defendant may have been leaving at one point while the victim was still alive, but, instead of leaving, he returned to the victim and cut her throat before she died. Defendant contends that the prosecutor's scenario of what occurred the morning of 12 September 2001 was unsupported by the evidence and, given that the story the crime scene tells is "absolutely critical" in deciding defendant's guilt, the trial court erred by not intervening. We disagree.

During closing arguments, prosecutors may create a scenario of the crime committed that is reasonably inferable from the evidence in the record. *State v. Ingle*, 336 N.C. 617, 645, 445 S.E.2d 880, 895 (1994), *cert. denied*, 514 U.S. 1020, 131 L. Ed. 2d 222 (1995). Such arguments rest within the discretion of the trial court, and counsel will be granted wide latitude in hotly contested cases. *State v. Roseboro*, 344 N.C. 364, 376, 474 S.E.2d 314, 320 (1996). Here, the prosecutor's inferences from the evidence presented were not so tenuous that the trial court needed to intervene. There was evidence presented at trial regarding the wounds inflicted upon the victim, blood sample analysis from various places throughout the house, and footprint identifications that were all available and used to infer the scenario suggested by the prosecutor. Further, the prosecutor himself informed the jury that his was just one interpretation of the evidence presented at trial. Reviewing the prosecutor's closing argument in light of the evidence presented at trial, we hold that there was sufficient evidence to support the scenario presented by the prosecutor. In light of the evidence, we cannot say that the prosecutor's argument was improper, much less so grossly improper as to require intervention *ex mero motu* by the trial court. This assignment of error is overruled.

[5] Defendant's fifth assignment of error is that the trial court erred by denying defendant's motion to dismiss because the evidence was insufficient to support a conviction for first-degree premeditated murder. When ruling on a motion to dismiss, the trial court must determine whether the prosecution has presented "substantial evidence of each essential element of the crime." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). "Substantial evidence is that amount of 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion.' " *State v. Williams*, 355 N.C. 501, 579, 565 S.E.2d 609, 654 (2002) (quoting *State v. Vick*, 341 N.C. 569, 583-84, 461 S.E.2d 655, 663 (1995)), *cert. denied*, 537 U.S. 1125, 154

L. Ed. 2d 808 (2003). In making its decision, the trial court must view the evidence in the light most favorable to the State. *State v. Hyatt*, 355 N.C. 642, 666, 566 S.E.2d 61, 77 (2002), *cert. denied*, 537 U.S. 1133, 154 L. Ed. 2d 823 (2003). Here, the trial court correctly determined that the State presented substantial evidence of each element of the crime of first-degree murder.

Defendant confessed to killing the victim by stabbing her repeatedly. In his confession, defendant claimed that something just came over him and he "went into a rage." His defense at trial was that his "rage" was not premeditated and he lacked the requisite intent for first-degree murder. For the jury to find defendant guilty of first-degree murder, it had to find that the murder was committed with premeditation and deliberation. Premeditation and deliberation, both processes of the mind, must generally be proven by circumstantial evidence. *State v. Small*, 328 N.C. 175, 181, 400 S.E.2d 413, 416 (1991). Circumstances which may be considered include: (1) lack of sufficient provocation by the victim; (2) defendant's conduct before and after the killing, including attempts to cover up involvement in the crime; and (3) evidence of the brutality of the crime, and the dealing of lethal blows after the victim has been rendered helpless. The State produced substantial evidence covering each of these circumstances.

First, the State presented evidence tending to show that the victim intended to tell defendant to stop coming to her home and to stop associating with Wagner. Defendant, by his own admission, establishes that the victim did tell him to stay away. Shortly thereafter, defendant "went into a rage" and began stabbing the victim. Although such request to stay away was presumably the trigger for defendant's actions, telling a casual acquaintance to stay away is definitely not sufficient provocation to compel a killing by stabbing or even "a rage."

Second, the State presented evidence that on the morning of the victim's murder, defendant lied to his wife about where he was going when he left their house. Defendant told his wife that he was going to the store when, in fact, he intended on going to see the victim. After the murder, defendant continued to lie to his wife and to others. Defendant cut his hands during the commission of the crime. He told his wife and a housemate that, while at the store, a man approached defendant and ordered him off of the pay phone. When defendant refused, the man pulled out a knife and cut defendant. Defendant went to the hospital for treatment, where he told a nurse he cut his

hands while stripping wires at work. He later told a police officer that he injured his hands during an altercation that occurred at his house. Then, when first questioned about the murder, defendant told police he injured his hands while stripping wires at home. Defendant told four different stories of how he injured his hands, in an attempt to avoid being linked to the crime. Additionally, when first questioned by police, defendant denied involvement and attempted to divert suspicion to Wagner by telling police that Wagner was abusive towards the victim.

Finally, the State's evidence shows that the victim was stabbed and cut approximately sixty times. Her skull was fractured and her throat was cut. Some of the stab wounds were so forceful that the knife handle left marks on the victim's body. Further, defendant admitted in his statement to police that he repeatedly stabbed the victim, even as she fell to the floor and tried to crawl away. The State presented substantial evidence of premeditation and deliberation. The trial court did not err in denying defendant's motion to dismiss because a reasonable jury could conclude from the evidence that defendant murdered the victim with premeditation and deliberation. This assignment of error is overruled.

[6] Defendant's sixth assignment of error is that the trial court erred by failing to intervene when the State, during its penalty phase closing argument, commented on defendant's failure to testify. N.C.G.S. § 8-54 provides that a defendant's failure to testify shall not create any presumption against him. To that end, prosecutors cannot directly refer to a defendant's failure to testify. *Griffin v. California*, 380 U.S. 609, 614, 14 L. Ed. 2d 106, 109 (1965). This is so because, "extended reference by the court or counsel concerning [defendant's failure to testify] would nullify the policy that the failure to testify should not create a presumption against the defendant." *State v. Randolph*, 312 N.C. 198, 206, 321 S.E.2d 864, 869 (1984). In determining whether a prosecutor's statement is, in fact, a direct reference to a defendant's failure to testify, the Court must consider whether " 'the language used [was] manifestly intended to be, or was . . . of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *United States v. Anderson*, 481 F.2d 685, 701 (4th Cir. 1973) (quoting *U.S. ex rel. Leake v. Follette*, 418 F.2d 1266, 1269 (2d Cir. 1969), *cert. denied*, 397 U.S. 1050, 25 L. Ed. 2d 665 (1970)), *aff'd*, 417 U.S. 211, 41 L. Ed. 2d 20 (1974). *See also State v. Rouse*, 339 N.C. 59, 95-96, 451 S.E.2d 543, 563 (1994), *cert. denied*, 516 U.S. 832, 133 L. Ed. 2d 60 (1995).

STATE v. SMITH

[357 N.C. 604 (2003)]

In the present case, the prosecutor made the following statements during his penalty phase closing argument.

One of the things you're going to hear is whether [Toby] Smith has any remorse for this killing. You heard the tape of the telephone conversation that was played from jail, and you heard [Toby] Smith say to his wife, "I didn't mean to kill that girl." Well, I'd say to you you've sat here for two weeks of trial. Have you seen any expression of remorse or regret from Wesley [Toby] Smith, Jr., other than when it had to do with his present predicament? . . . . Did you see any reaction from him on the verdict from this jury? The only time Wesley [Toby] Smith has shown any remorse is remorse over his own condition.

Defendant contends that the jury could have only understood these statements to be a reference to defendant's failure to testify at trial and at the sentencing hearing. We disagree.

The prosecutor's statements, viewed as a whole, do not make reference to defendant's failure to testify. Rather, the prosecutor was commenting on defendant's demeanor. The jury may properly consider the demeanor of defendant in making its sentencing decision. The prosecutor, referring to the tape recorded telephone conversation between defendant and his wife, asked the jury if it had heard any remorse from defendant. The prosecutor also asked the jury if it had seen any remorse from defendant during the trial. Viewing the prosecutor's statements as a whole, it is clear that he did not intend to comment on defendant's failure to testify. Further, the prosecutor's statements were not of such a character that the jury would take the statements to be a reference to defendant's failure to testify. This assignment of error is without merit and is overrruled.

[7] Defendant's seventh assignment of error is that the trial court erred by failing to inquire whether defendant wished to testify at his sentencing proceeding. Defendant contends that he has a constitutional right to testify on his own behalf, and that this right was violated because the trial court did not inquire as to whether defendant wished to testify at the sentencing proceeding. This Court has never required trial courts to inform a defendant of his right to testify or to make an inquiry on the record regarding his waiver of the right to testify. *State v. Carroll*, 356 N.C. 526, 533, 573 S.E.2d 899, 905 (2002), *cert. denied*, —— U.S. ——, 156 L. Ed. 2d 640 (2003). While defendant does have a constitutional right to testify, this right was not violated in the instant case. In *State v. Hayes*, 314 N.C. 460, 334 S.E.2d 741

(1985), this Court held that absent a defendant's indication that he wished to testify, it cannot be said that the trial court denied defendant of his right. *Id.* at 474-75, 334 S.E.2d at 750.

After all evidence was presented at the guilt-innocence phase of the trial, defendant's attorney made it clear to the trial court that defendant wished to waive the right to testify on his own behalf. Defendant's attorney informed the trial court that defendant had been continuously consulted throughout the trial regarding his right to testify, and defendant was informed that it was solely his decision whether to testify on his own behalf. Defendant's attorney further informed the trial court that defendant had chosen not to testify in his own defense. At that point, defendant affirmed to the trial court that he had decided not to testify. Defendant presented testimony from nineteen witnesses at his sentencing proceeding, and he did not testify on his own behalf. Defendant's attorney was by his side at all times and available to counsel defendant regarding his right to testify. Given these circumstances, and because defendant never made a request to testify on his own behalf, we cannot say that defendant's rights were violated. This assignment of error is without merit and is overruled.

**[8]** Defendant's eighth assignment of error is that the trial court did not have the jurisdiction to enter a death sentence against defendant because the indictment did not allege any aggravating circumstances. This Court recently considered and rejected this argument in *State v. Hunt*, 357 N.C. 257, 582 S.E.2d 593, *cert. denied*, —— U.S. ——, 156 L. Ed. 2d 702 (2003). This assignment of error is, therefore, overruled.

**[9]** Defendant's ninth assignment of error is that the trial court did not have the jurisdiction to convict defendant of first-degree murder because he was charged by a short-form indictment that did not specifically allege the elements necessary for first-degree murder. Defendant, recognizing that previous decisions by this Court have been contrary to his position in this argument, raises this issue for the purpose of preserving it for possible further judicial review of this case. We have considered defendant's arguments on this issue and find no reason to depart from our previous holdings. This assignment of error is overruled.

**[10]** Defendant's tenth assignment of error is that he was deprived of the effective assistance of counsel because his trial attorney failed to move for dismissal of the charges due to a lack of jurisdiction. To prevail in his argument, defendant must satisfy a two-part test, first set

out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984). Under *Strickland*, a defendant must establish (1) that his counsel's performance was deficient and (2) that the deficiencies prejudiced the defendant. *Id.* In order to prevail, a defendant must establish that his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The errors must have been "so serious as to deprive the defendant of a fair trial." *Id.* In the case *sub judice*, defendant has not met his burden in this regard. As discussed above, the indictment charging defendant was proper and the trial court had jurisdiction to convict defendant of first-degree murder and to sentence him to death. Since the indictment was legally sufficient, defendant's counsel's failure to object to it was not a deficiency in performance, and there was no prejudice to defendant. Defendant cannot meet the requirements for an ineffective assistance of counsel claim, and therefore, this assignment of error is overruled.

Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we must now review the record and determine: (1) whether the evidence supports the aggravating circumstance found by the jury and upon which the sentencing court based its sentence of death; (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2) (2001).

[11] After a thorough review of the record on appeal, briefs, and oral arguments of counsel, we conclude that the evidence fully supports the aggravating circumstance found by the jury. The jury found, as an aggravating circumstance, that the murder of the victim was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9) (2001). The victim was stabbed approximately sixty times in her own home. Defendant continued to stab the victim even as she fell to the ground and attempted to crawl away. Evidence presented by the State tended to show that it took approximately ten minutes for the victim to die. The circumstances of the victim's death provide ample support for the jury's finding of the above aggravating circumstance. Further, we conclude there is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore turn to our final statutory duty of proportionality review.

STATE v. SMITH

[357 N.C. 604 (2003)]

[12] We conduct a proportionality review to "eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In doing so, we must look at both the defendant and the crime. *State v. Watts,* 357 N.C. 366, 379, 584 S.E.2d 740, 750 (2003). In the present case, the jury found the existence of one aggravating circumstance: that the murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9).

The trial court submitted five statutory mitigating circumstances, including the "catchall" circumstance, of which the jury found none to exist. The trial court additionally submitted sixteen nonstatutory mitigating circumstances, of which the jury found only four to exist: (1) defendant had no history of violence or aggression toward others; (2) defendant's mother was tragically killed in a car accident when he was fifteen years old and this had a dramatic impact on him; (3) defendant loves and cares for his family, consisting of his father, two sisters, and three children; and (4) defendant admitted his guilt to police officers.

We begin our proportionality review by comparing this case to the eight cases where this Court has determined the sentence of death to be disproportionate. *See State v. Kemmerlin,* 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson,* 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983). After careful review, we conclude that this case is not substantially similar to any case in which this Court has previously found the death penalty disproportionate.

First, defendant was convicted of first-degree murder on the basis of premeditation and deliberation, the finding of which " 'indicates a more cold-blooded and calculated crime.' " *State v. Haselden,* 357 N.C. 1, 30, 577 S.E.2d 594, 612 (quoting *State v. Artis,* 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds,* 494 U.S. 1023, 108 L. Ed. 2d 604 (1990)), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 72 U.S.L.W. 3308 (2003). Additionally, the

victim was murdered in her own home, a factor which "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). Further, the murder was found to be especially heinous, atrocious, or cruel under N.C.G.S. § 15A-2000(e)(9). These factors distinguish the present case from those in which this Court has found the sentence of death to be disproportionate.

In conducting a proportionality review, we must also compare this case with prior cases where this Court has found the death penalty to be proportionate. *Haselden*, 357 N.C. at 31, 577 S.E.2d at 613. Although this Court reviews all similar cases when engaging in our duty of proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* at 31, 577 S.E.2d at 613 (quoting *State v. McCollum*, 334 N.C. 208, 244, 433 S.E.2d 144, 164 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994)). Upon comparison of the present case with those in which we have previously conducted a proportionality review, we conclude that this case is more similar to cases in which this Court has found the sentence of death proportionate than to those in which this Court has found the sentence of death disproportionate.

The similarities between this case and prior cases in which a sentence of death was found proportionate "merely serves as an initial point of inquiry." *State v. Daniels*, 337 N.C. 243, 287, 446 S.E.2d 298, 325 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). The final decision of whether a death sentence is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994). Therefore, having thoroughly reviewed the entire record in this matter, and based upon the characteristics of this defendant and the crime he committed, we cannot conclude as a matter of law that the sentence of death in this case is disproportionate or excessive.

Accordingly, we hold that defendant received a fair trial and capital sentencing proceeding, free of prejudicial error.

NO ERROR.