STATE OF NORTH CAROLINA v. SCOTT DAVID ALLEN

No. 115A04

(Filed 3 March 2006)

## 1. Constitutional Law— fair trial—knowing use of false testimony

There was no violation of defendant's right to a fair trial through the knowing use of false testimony where the evidence was not verifiably false or known to be false by the prosecution. There is a difference between the knowing presentation of false testimony and knowing that testimony conflicts in some manner.

## 2. Criminal Law— prosecutor's closing argument—inferences

There was no plain error in a closing argument in which the prosecutor's inferences from the evidence were reasonable.

## 3. Criminal Law— prosecutor's argument—jury's observations—size of witness

It was reasonable for a prosecutor to argue that it would be hard to imagine an accomplice shooting the victim because of the angle of the shooting and the size of the accomplice. The jury had the opportunity to observe the accomplice's characteristics when she testified; the evidence is not only what jurors hear from the stand, but what they witness in the courtroom.

## 4. Criminal Law— prosecutor's argument—victim firing weapon

There was sufficient evidence in a first-degree murder prosecution to support the prosecutor's argument that the victim had fired his handgun around the time of the murder. Moreover, it was a reasonable inference that the victim's handgun simply jammed.

## 5. Sentencing— discretion to proceed capitally—reliance on testimony of accomplice

The testimony of an accomplice is sufficient to uphold a criminal conviction, and the prosecution here did not abuse its discretion by proceeding capitally based on the testimony of accomplices after enactment of N.C.G.S. § 15A-2004(a) (2005) (which granted prosecutors discretion in determining whether to pursue the death penalty when an aggravating circumstance exists).

**6. Sentencing— capital—victim impact statement—dream of victim's death**

The trial court did not err by not intervening ex mero motu during a victim impact statement in a capital sentencing proceeding. Although the witness testified that she "dreamed the dream or the reality" and "knew" her brother "had been shot," there is nothing in the testimony to indicate that she was describing a supernatural experience in which she witnessed the event. Regardless, defendant presented nothing to indicate that the jury was unduly swayed by this testimony.

**7. Sentencing— capital—aggravating circumstance—especially heinous, atrocious or cruel—sufficiency of evidence**

There was sufficient evidence for submission of the especially heinous, atrocious, or cruel aggravating circumstance in a capital sentencing proceding where defendant first fired with buckshot from close range with a twelve-gauge shotgun; that blast would likely have been fatal, but defendant shot his victim again, in the knee, with birdshot, leaving him incapacitated and guaranteeing that he would be unable to seek assistance or defend himself; although the medical examiner testified that the victim would likely have been rendered unconscious within minutes, eyewitness testimony was that the victim was not immediately rendered unconscious; defendant crept to the victim on his stomach, throwing rocks to see if the victim was dead; the victim cried out in pain from the rocks; and the victim was aware of his impending death as he lay on the ground, unable to change the outcome.

**8. Sentencing— capital—aggravating circumstance—pecuniary gain—sufficiency of evidence**

There was sufficient evidence to submit the pecuniary gain aggravating circumstance in a capital sentencing proceeding where the evidence tended to show that defendant first murdered the victim and stole his truck, then sent his girlfriend to the victim's house for the victim's wallet; he directed use of the victim's ATM card to obtain cash for drugs, and finally sold the truck to finance his escape. Although he did not take nearly $2,000 which the victim had in his possession at the shooting, the victim had a firearm which he tried to fire at least once and the jury could reasonably have believed that defendant did not take the money because of fear.

**9. Constitutional Law— double jeopardy—pecuniary gain aggravating circumstance—felony murder**

The submission of the pecuniary gain aggravating circumstance in a capital sentencing proceeding did not violate the bar against double jeopardy where the jury had not found defendant guilty of felony murder and defendant argued that both the felony murder allegation and the pecuniary gain aggravator were based on the same evidence. Contrary to its instructions, the jury did not mark anything on the verdict form concerning felony murder; the jury's failure to follow instructions does not amount to an acquittal where the defendant was also convicted of first-degree murder on another theory.

**10. Sentencing— capital—aggravating circumstances—instructions**

The trial court did not err in a capital sentencing proceeding when it instructed the jury that "our law identifies the aggravating circumstances which must justify a sentence of death. Or which might justify a sentence of death." No prejudice to defendant occurred by the court's quickly corrected slip of the tongue.

**11. Sentencing— capital—residual doubt instruction—refused**

The trial court did not err in a capital sentencing proceeding by not giving a requested residual doubt instruction. As the U.S. Supreme Court has said, sentencing concerns how rather than whether defendant committed the crime.

**12. Constitutional Law— effective assistance of counsel—further factual inquiry**

A first-degree murder defendant's contentions regarding ineffective assistance of counsel were dismissed without prejudice where further factual inquiry was required.

**13. Homicide— first-degree murder—short-form indictment—constitutional**

A short-form indictment for first-degree murder was sufficient.

**14. Homicide— first-degree murder—indictment—aggravating circumstances not listed**

The trial court had jurisdiction to enter a death sentence where the indictment did not list the aggravating circumstances to be proven by the State during the penalty phase.

STATE v. ALLEN

[360 N.C. 297 (2006)]

**15. Sentencing— capital—aggravating circumstances—especially heinous, atrocious, or cruel—not unconstitutionally vague**

The jury instruction on the especially heinous, atrocious, or cruel aggravating circumstance is not unconstitutionally vague and overbroad.

**16. Sentencing— capital—mitigating circumstances—instruction—burden of proof**

Using the word "satisfy" in an instruction on burden of proof in mitigating circumstances was not vague and subjective, and did not create a standardless standard.

**17. Sentencing— capital—time for appeal—not torturous**

The time for appeals in capital cases and the conditions of detention while awaiting appeal do not violate Article VII of the International Covenant on Civil and Political Rights. Article VII condemns torture; it is not torturous to allow a defendant to appeal his conviction and sentence. A defendant's rights are not violated merely because he chooses to subject himself to the rigors of judicial review. Moreover, the United States deposited a reservation to the ICCPR concerning capital punishment.

**18. Sentencing— death—proportionate**

A death penalty was not disproportionate when compared with other cases.

Justice TIMMONS-GOODSON did not participate in the consideration or decision of this case.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Judge Anderson D. Cromer on 18 November 2003 in Superior Court, Montgomery County, upon a jury verdict finding defendant guilty of first-degree murder. On 6 December 2004, the Supreme Court allowed defendant's motion to bypass the Court of Appeals as to his appeal of an additional judgment. Heard in the Supreme Court 14 September 2005.

*Roy Cooper, Attorney General, by Robert C. Montgomery and Daniel P. O'Brien, Assistant Attorneys General, for the State.*

*Staples S. Hughes, Appellate Defender, by Barbara S. Blackman, Assistant Appellate Defender, for defendant-appellant.*

**STATE v. ALLEN**

[360 N.C. 297 (2006)]

BRADY, Justice.

On 9 July 1999, defendant Scott David Allen, his girlfriend Vanessa Smith, and Christopher Gailey entered the Uwharrie National Forest on their way to a cabin located deep therein. While in the forest, defendant shot Christopher Gailey twice, once in the back and once in the knee, with a twelve-gauge shotgun. Christopher Gailey died as a result of these wounds. On 24 January 2000, defendant was indicted by the grand jury of Montgomery County for the murder of Christopher Gailey, felonious larceny, and felonious possession of stolen goods. On 13 November 2003, a jury found defendant guilty of all charges. On 18 November 2003, the same jury returned a binding recommendation of death, and the trial court sentenced defendant accordingly. The trial court consolidated the two remaining offenses for judgment and sentenced defendant in the presumptive range to an active term of incarceration of ten to twelve months. Defendant appealed his convictions and sentence of death to this Court pursuant to N.C.G.S. § 7A-27(a). We find no error in defendant's conviction or his sentence.[1]

## FACTUAL BACKGROUND

Before his 1998 escape from a North Carolina Department of Corrections work release program in which he was serving a sentence for numerous felony breaking or entering and felony larceny convictions, defendant met Vanessa Smith and they became romantically involved. Immediately following defendant's escape from the work release program, he met Smith in a parking lot, and the couple began moving around from hotel to hotel in this state, which Smith paid for with proceeds from a large settlement arising from her father's death. The couple also traveled to and resided sporadically in Chicago, Illinois; Spokane, Washington; San Diego, California; and Denver, Colorado, continuing to live primarily from the proceeds of Smith's settlement and spending large amounts of money on illegal drugs. Notably, while in Spokane, Smith paid a friend, Byron Johnson, five hundred dollars for a copy of his birth certificate and another

---

1. While defendant assigns error to all his convictions, he has presented no argument in his brief concerning these convictions other than his conviction of first-degree murder and the death sentence which arose from that conviction. "Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned." N.C. R. App. P. 28(b)(6) (2005); *See State v. McNeill*, 360 N.C. 231, 624 S.E.2d 329, 336 (2006); *State v. Augustine*, 359 N.C. 709, 731 n.1, 616 S.E.2d 515, 531 n.1 (2005). Accordingly, the assignments of error related to defendant's non-capital convictions are taken as abandoned and dismissed.

identifying document. Defendant subsequently obtained a driver's license from the State of Washington in the name of Byron Johnson.

Defendant's travels eventually brought him back to North Carolina, and in the summer of 1999, defendant, identifying himself as Byron Johnson, moved into a mobile home near Badin Lake, and Smith soon moved in with him. This mobile home was owned by Robert Johnson. In addition to defendant and Smith, Robert Johnson, Christopher Gailey, and Danny Lanier and his family resided in the mobile home. Christopher Gailey and defendant were long-time friends, but Smith never considered Gailey a friend. Life at the mobile home consisted of heavy partying, drinking, and drug abuse. Much of the drugs were provided by Gailey.

On 9 July 1999, the day of the murder, defendant told Smith and Gailey he had stashed some firearms in a cabin in the Uwharrie Forest, and they should retrieve them to sell the firearms for drugs. Robert Johnson testified he saw the three leave in Danny Lanier's truck, while Smith testified they left in Gailey's vehicle, a GMC pickup truck valued at $16,000. The three arrived that evening at the Uwharrie Forest, after which they entered the forest and walked for what Smith described as at least an hour. Smith smoked marijuana while defendant and Gailey used cocaine. Gailey carried a .45 caliber handgun, while defendant carried Gailey's twelve-gauge shotgun with a black pistol grip.

As they walked single file down a very narrow trail, defendant pushed Smith to the ground. He then fired the shotgun twice, first delivering a heavy buckshot blast into Gailey's back, and then firing lighter birdshot into Gailey's knee. Smith testified that she and defendant then went to the nearby cabin to sit and wait for Gailey to die. According to Smith's testimony, for seven to eight hours after defendant shot Gailey, he would creep over on his stomach to Gailey's body to throw rocks at him to discover if he would make a noise. During this waiting period, defendant told Smith that Gailey would never call her a "bitch" again and that he could not believe Gailey turned on him and was going to "rat him off" by reporting his location to the authorities. Eventually, defendant and Smith left the forest. On their way out, defendant told Smith that their story would be someone in the forest shot Gailey, and that a guy named Dustin had reason to want to harm Gailey. Smith testified that she heard Gailey fire his handgun numerous times as the couple left the forest.

Next, at defendant's direction Smith drove back to the trailer to get their belongings and to steal Gailey's wallet which included Gailey's automated teller machine (ATM) card. Smith ingested eight Xanax pills and then, driving Gailey's truck picked up defendant near the Uwharrie Forest, where he had previously hid the shotgun used in the murder. The couple then drove to Shallotte, North Carolina, to see Smith's friend, Jeff Brantley. Apparently Smith and defendant talked to some of the partygoers at Brantley's residence, one of whom was Jeffrey Page. Defendant wanted to sell Gailey's truck to Page for eight hundred dollars, and he explained to Page that the truck was owned by a "fellow" he shot in the forest. Smith testified she did not remember much that occurred in Shallotte, save a few times when defendant forced her to use Gailey's ATM card, until she woke up two days later at her former lesbian lover Lilly Efird's home.

Page decided to purchase the truck, and on 12 July 1999, drove to Albemarle, North Carolina along with Brantley, and two other men, to acquire the funds for the purchase. Upon their return to Shallotte, Page purchased the truck from defendant. Page subsequently sold the truck to a junk dealer in South Carolina.

Defendant, eight hundred dollars in hand, left for Denver once again. Smith and Efird traveled to Shallotte, and Smith borrowed, or according to Efird stole, Efird's money and car in order to travel to Denver to see defendant, believing she was pregnant with defendant's baby. After she arrived in Denver, she argued with defendant and became afraid he was going to kill her. Therefore, she returned to North Carolina and turned herself into the Charlotte-Mecklenburg Police, recounting the facts of the murder. Defendant was soon arrested in Denver. He made no incriminating statements and continually denied committing the murder during his post-arrest interrogation.

Gailey's body was discovered on 11 July 1999 when Wesley Hopkins drove by it during an all-terrain vehicle expedition in the Uwharrie National Forest. John Butts, M.D., the State's Chief Medical Examiner, stated the autopsy of Gailey showed a shotgun wound to the back that exited in five different locations on the victim's right chest. This wound caused extensive bleeding and damage to his lung, ribs, and large blood vessels. According to Dr. Butts, this wound would have rendered the victim unconscious in a matter of minutes, and death would have followed relatively quickly. Additionally, the shot to the knee incapacitated Gailey such that he would have been

STATE v. ALLEN

[360 N.C. 297 (2006)]

unable to move or seek medical assistance. Dr. Butts was of the opinion it would have been extremely unlikely, considering the amount of blood lost, a person with those wounds would have survived even one or two hours.

Law enforcement found at the scene of the crime five spent shotgun shells, numerous live .45 caliber cartridges in a pouch attached to Gailey's belt loop, a full magazine for a .45 caliber handgun, and a .45 caliber handgun with one expended .45 caliber round casing still chambered. A yellow container found on or near Gailey's body contained $1,944.05 in currency.

Defendant presented no evidence during the guilt-innocence proceeding of the trial. The jury returned verdicts of guilty of first degree murder based on a theory of malice, premeditation, and deliberation; larceny; and felonious possession of stolen goods.

In the penalty proceeding, the State presented victim impact evidence by way of Gailey's mother, father, and sister. Defendant presented testimony of family members, a former teacher's assistant, and an expert who opined defendant would adapt well to prison life. The statutory aggravating circumstances submitted to the jury for consideration were: (1) The murder was committed for the purpose of avoiding or preventing a lawful arrest; (2) the murder was committed for pecuniary gain; and (3) the murder was especially heinous, atrocious, or cruel. The jury answered all of these aggravating factors in the affirmative. The jury also found two nonstatutory mitigating factors: (1) Scott Allen was deeply affected by the death of his grandfather; and (2) Scott Allen's death would have a detrimental impact on his mother, father, daughter, and other family members. The jury found unanimously and beyond a reasonable doubt that the mitigating circumstances were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to impose a sentence of death. The jury therefore returned a binding recommendation of death.

## ANALYSIS

### GUILT-INNOCENCE PROCEEDING ISSUES

[1] Defendant alleges the prosecution violated his right to a fair trial by the knowing use of false testimony. This Court has previously stated:

[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must

fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears. Further, with regard to the knowing use of perjured testimony, the Supreme Court has established a standard of materiality under which the knowing use of perjured testimony requires a conviction to be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Thus, [w]hen a defendant shows that testimony was in fact false, material, and knowingly and intentionally used by the [S]tate to obtain his conviction, he is entitled to a new trial.

*State v. Williams*, 341 N.C. 1, 16, 459 S.E.2d 208, 217 (1995) (alterations in original) (quotation marks and citations omitted), *cert. denied*, 516 U.S. 1128 (1996). We note today there is a difference between the knowing presentation of false testimony and knowing that testimony conflicts in some manner. It is for the jury to decide issues of fact when conflicting information is elicited by either party. *See, e.g., State v. Boykin*, 298 N.C. 687, 694, 259 S.E.2d 883, 888 (1979), *cert. denied*, 442 U.S. 911 (1980). In fact, if inconsistent information is elicited from a witness, the party who called that witness may impeach him or her. *See* N.C.G.S. § 8C-1 Rule 607 (2005).

Here, defendant argues the prosecution violated defendant's constitutional rights by offering two portions of Smith's testimony. First, defendant contends Smith's testimony she and defendant waited seven to eight hours in the Uwharrie Forest for the victim to die and they left the scene while he was still alive was demonstrably false testimony and known to be so by the prosecution. Second, defendant contends Smith's testimony that she "heard, I'm assuming it was Chris empty his gun out" was also demonstrably false and known to be so by the prosecution.

As to defendant's first contention, we note the length of time it took the victim to die in this case is not easily proved. While the State Medical Examiner, Dr. John Butts, testified Gailey would not have survived as long as seven to eight hours, that testimony was his medical opinion. It cannot be said either Smith's statement or the opinion of Dr. Butts is verifiably false, much less that Smith's statement was knowingly false when elicited. In fact, during closing arguments, the prosecution admitted that Smith's perception of time "may not have been correct." Merely because inconsistent testimony is presented, it does not follow that such testimony is knowingly and demonstrably false.

Similarly, the testimony about the "emptying" of the victim's handgun, while unlikely to be accurate, cannot be said to have been known as false by the prosecution. Smith was a confessed drug addict and under the influence of drugs at the time of the murder. This, along with her prior convictions and other circumstances of her lifestyle revealed at defendant's trial, made her a witness with less-than-perfect credibility.

However, the prosecution did not violate defendant's constitutional rights by submitting conflicting testimony when nothing in the record tends to show the prosecution knew the testimony was false. The prosecution could have truly believed Smith was simply mistaken and did not hear as many shots as she thought due to her drug abuse or just plain fear. Because we are unpersuaded the prosecution knew Smith intended to make false statements, we overrule defendant's assignment of error.

## CLOSING ARGUMENT ISSUES

Defendant claims the prosecution's closing arguments in both the guilt-innocence and penalty proceedings violated notions of fundamental fairness because the prosecution "plugged a crucial hole" by mentioning evidence outside the record. Defendant notes five instances in which he alleges the prosecution's argument contained facts outside the evidence presented: (1) Defendant devised a plan to lure Gailey into the woods in order to murder him; (2) a cache of firearms was never discovered in the woods; (3) the weather was hot on 9 July 1999 in the Uwharrie forest, which purportedly explained why Gailey's shirt was found lying on the ground; (4) that it would be impossible for Smith to inflict the deadly wounds upon Gailey due to the height differential between them; and (5) Gailey fired his .45 caliber handgun once, after which the handgun jammed.

In a hotly contested trial, such as a capital case, "[t]he scope of jury arguments is left largely to the control and discretion of the trial court, and trial counsel will be granted wide latitude." *State v. Call*, 349 N.C. 382, 419, 508 S.E.2d 496, 519 (1998). Counsel may argue any facts in the record and any reasonable inference that may be drawn from any facts in the record. *See id.* Here, defendant did not object to any statements now complained of during the arguments before the trial court and now argues the trial court should have intervened *ex mero motu*. However, we will not find error in a trial court's failure to intervene in closing arguments *ex mero motu* unless the remarks were so grossly improper they rendered the trial and conviction fun-

damentally unfair. *Id.* at 419-20, 508 S.E.2d at 519. We disagree with defendant's contentions, and we find no error in the trial court's decision concerning this argument.

[2] Defendant's first contention that no evidence supported the statement made by the prosecution that defendant devised a plan to lure the victim into the forest is without merit. Defendant concedes in his brief that some evidence existed in the record to draw this inference—namely Smith's testimony that the victim did not usually hike in the woods, the victim did not want to go into the woods, and defendant talked the victim into entering the woods. It is a reasonable inference both the prosecution and the jury could make that defendant previously contrived a plan to lure his long-time friend into the forest for the purpose of ending his friend's life. Therefore, the prosecution's argument was consistent with N.C.G.S. § 15A-1230(a), which allows argument of any conclusion based on counsel's analysis if the conclusion is consistent with the evidence.

Similarly, a reasonable inference could be made that no firearms existed at the site where the body was found. As stated earlier, defendant allegedly told his victim he had stashed firearms in a cabin in the forest and they should retrieve the firearms to sell them. Smith testified that while they were walking in the forest, defendant changed his story about where the firearms were located. In addition, the only testimony concerning a weapon found at the scene of the crime was testimony about the victim's .45 caliber handgun. Because of the testimony establishing the only weapon at the scene of the crime was the handgun, it is reasonable to infer that in fact no firearms existed and thus the assertion made by defendant about the firearms constituted nothing more than a ploy to lure the victim into the forest for his execution.

A reasonable inference could also be drawn that the victim removed his own shirt during the hike into the woods. This matter is relevant because a photograph of the crime scene showed a large rock atop Gailey's shirt. Smith testified "[i]t was hot" on the day of the shooting, and a crime scene photograph of the victim's body clearly shows his shirt removed. It is reasonable to infer that the victim removed his shirt before he was shot and before the rocks were thrown at him.

[3] Defendant also takes issue with the prosecution's argument asserting it "would be hard to imagine" Smith shooting the victim because of her size. The jury had the opportunity to observe Smith's

physical characteristics when she testified. *See State v. Brown,* 320 N.C. 179, 199, 358 S.E.2d 1, 15 (discussing how "evidence is not only what [jurors] hear on the stand but what they witness in the courtroom."), *cert. denied,* 484 U.S. 970 (1987). The jury also heard testimony from Dr. John Butts, the State Medical Examiner, which confirmed the wounds traveled in such a manner that one could reasonably infer the shotgun pellets traveled slightly downward. Because the jury could see Smith's height, and could infer the pellets from the shotgun blast to the back traveled in a downward motion, it is a reasonable inference that it is unlikely Smith inflicted the wound.

[4] Defendant posits no evidence existed in the record tending to show the victim fired a firearm during the altercation. However, Smith testified she heard Gailey fire his handgun multiple times. Likewise, the crime scene technician testified a spent casing remained in Gailey's .45 caliber handgun. The prosecution needed to present no further evidence on this point in order to support a reasonable inference that Gailey fired his handgun during the time frame surrounding the murder. Similarly, we find it unnecessary for the State to present expert testimony on exactly what it means for a spent casing to be found inside a semiautomatic .45 caliber handgun, as it is a reasonable inference the handgun simply jammed. Therefore, the assignments of error are overruled.

## PENALTY PHASE ISSUES

[5] Defendant claims the prosecution abused its discretion by proceeding capitally in this case after enactment of N.C.G.S. § 15A-2004(a) (2005).[2] We note first that defendant did not make this argument at trial, and we generally will not consider a theory on appeal that differs from the constitutional theory argued at the trial court. *See State v. Benson,* 323 N.C. 318, 321-22, 372 S.E.2d 517, 519 (1988). Nonetheless, defendant's argument before this Court lacks merit. Defendant claims because the prosecution decided to proceed capitally, based in large part upon the testimony of two accomplices, it abused the discretion granted by section 15A-2004(a). As prosecutors have often realized, "to try the devil, you have to go to hell to get your witnesses." *See e.g., State v. Bell,* 359 N.C. 1, 21, 603 S.E.2d 93, 107 (2004), *cert. denied,* —— U.S. ——, 125 S. Ct. 2299, 161 L. Ed. 2d

---

2. The General Assembly enacted this subsection, effective in 2001, to grant prosecutors discretion in determining whether to pursue the death penalty against a defendant even if substantial evidence supporting an aggravating circumstance exists.

1094 (2005). This Court has long held the testimony of an accomplice is sufficient to uphold a criminal conviction. *See State v. Bailey*, 254 N.C. 380, 385, 119 S.E.2d 165, 169 (1961) (" 'No one can seriously doubt that a conviction is legal, though it proceed upon the evidence of an accomplice only.' ") (quoting *Rex v. Jones*, 2 Camp. 131, 132 (1809) *reprinted in* 170 Eng. Rep. 1105 (1927)). Here the prosecution could reasonably believe the story told by the accomplices to be true and believable. While eyewitness testimony is often contradictory, the record in this case establishes the witnesses were consistent as to the basic facts. Also, the collective testimony and the evidence presented at trial supported the three aggravating circumstances found by the jury, as discussed elsewhere in this opinion.

Additionally, to prevail on a claim of prosecutorial abuse of discretion, defendant must show a discriminatory purpose and a discriminatory effect. *See State v. Garner*, 340 N.C. 573, 588, 459 S.E.2d 718, 725 (1995), *cert. denied*, 516 U.S. 1129 (1996). Here there is no evidence of either. The only assertion made by defendant is that because the evidence for a conviction rested heavily on the testimony of two accomplices whose criminal charges were reduced or dismissed in exchange for their testimony, this somehow makes the decision to prosecute the case capitally an abuse of discretion. We decline to find an abuse of discretion in this case and overrule defendant's assignment of error.

**[6]** Defendant alleges the trial court erred by failing to intervene, without objection from defendant, during allegedly inflammatory victim impact testimony from the victim's sister. The prosecution asked: "Ms. Overstreet, would you tell us how the death of your brother has impacted your life?" She answered:

> I'm a mom of four. One being my stepchild, two my daughters, and one son. I had my life going. I was a manager for a restaurant. I always served people with pride, left them with a smile. I felt things happening that night that nobody could ever experience, and I knew that my little brother, I know that he had been shot. I had dreamed the dream or reality. They became—I couldn't handle my job. I couldn't handle being around people. I suffered such severe panic attacks that I withdrew. I sought help for four and half years [sic] to be able to stand just this little bit of strength. My brother was my sidekick. I looked at him for happiness and joy because he made me complete. . . .

Ms. Overstreet continued testifying that defendant's act "destroyed my children's life because they see their mother in so much pain that words cannot describe." She also testified her world was "devastated" and that she lost her mind and ability to function.

Because defendant did not object to the testimony when given during the penalty proceeding, we review the statements only for plain error. *See State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). In order to prevail on a theory of plain error, " 'defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result.' " *State v. Haselden*, 357 N.C. 1, 13, 577 S.E.2d 594, 602 (quoting *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993), quoted in *State v. Roseboro*, 351 N.C. 536, 553, 528 S.E.2d 1, 12, *cert. denied*, 531 U.S. 1019 (2000)), *cert. denied*, 540 U.S. 988 (2003). Therefore, in this case defendant must convince this Court that Ms. Overstreet's testimony was error and but for that error the jury probably would have recommended a sentence of life without parole. Defendant has failed to meet this burden.

Victim impact statements are relevant and admissible to aid the jury in its decision whether to recommend a sentence of death. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991). North Carolina law allows victim impact testimony by statute. *See* N.C.G.S. § 15A-833 (2005); *State v. Roache*, 358 N.C. 243, 314-15, 595 S.E.2d 381, 426-27 (2004). The admissibility of victim-impact testimony is limited by the requirement that the evidence not be so prejudicial it renders the proceeding fundamentally unfair. *See State v. Nicholson*, 355 N.C. 1, 38-40, 558 S.E.2d 109, 135-36, *cert. denied*, 537 U.S. 845 (2002).

Defendant asserts Ms. Overstreet gave testimony as a "psychic" eyewitness to the event, entering into "the realm of the fantastic." We disagree. The witness was describing the emotional and psychological effect of the victim's death on her own life. Although she "dreamed the dream or the reality" and "knew" her brother "had been shot" there is nothing in the testimony to indicate she was describing some sort of supernatural experience in which she witnessed the event. She could just as easily have been describing what happened to her after discovering her brother's untimely death. Regardless, even if this testimony were error, defendant has presented nothing which would suggest the jury was unduly swayed by this testimony. Considering the three aggravating circumstances found, we cannot say that in the absence of this testimony the jury probably would

have recommended a sentence of life without parole. Defendant's assignment of error is overruled.

[7] Defendant argues the State presented insufficient evidence to support submission of the especially heinous, atrocious, or cruel aggravating circumstance (HAC) to the jury. N.C.G.S. § 15A-2000(e)(9) (2005). "In determining whether the evidence is sufficient to support the trial court's submission of the especially heinous, atrocious, or cruel aggravator, we must consider the evidence 'in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.' " *State v. Flippen,* 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998) (quoting *State v. Lloyd,* 321 N.C. 301, 319, 364 S.E.2d 316, 328, *sentence vacated on other grounds,* 488 U.S. 807 (1988)), *cert. denied,* 526 U.S. 1135 (1999). We have previously characterized three types of murders for which submission of HAC may be proper:

> One type includes killings physically agonizing or otherwise dehumanizing to the victim. A second type includes killings less violent but "conscienceless, pitiless, or unnecessarily torturous to the victim," including those which leave the victim in her "last moments aware of but helpless to prevent impending death." A third type exists where "the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder."

*State v. Gibbs,* 335 N.C. 1, 61-62, 436 S.E.2d 321, 356 (1993) (citations omitted), *cert. denied,* 512 U.S. 1246 (1994).

Defendant argues his case is more like two cases in which this Court found evidence of HAC to be insufficient. *See State v. Lloyd,* 354 N.C. 76, 552 S.E.2d 596 (2001); *State v. Stanley,* 310 N.C. 332, 312 S.E.2d 393 (1984). Both *Lloyd* and *Stanley* involved murders committed by multiple gunshots occurring in rapid succession, resulting in the victim's quick incapacitation and loss of consciousness. However, the evidence in the case *sub judice* substantially supports a finding the murder was the second type of murder described above, one "less violent but 'conscienceless, pitiless, or unnecessarily torturous to the victim,' including those [murders] which leave the victim in [his] 'last moments aware of but helpless to prevent impending death.' " *State v. Gibbs,* 335 N.C. at 61-62, 436 S.E.2d at 356 (citations omitted).

Although there was evidence presented at trial through Dr. Butts that the victim would likely have been rendered unconscious within

a number of minutes, there was also evidence presented at trial through eyewitness testimony of Vanessa Smith that the victim was not immediately rendered unconscious. Defendant's first shot with buckshot was from close range with a twelve-gauge shotgun. The blast would have likely been fatal. Yet defendant shot his victim again, this time in the knee. In doing so, defendant left the victim totally incapacitated, guaranteeing he would be unable to seek medical assistance or defend himself. Additionally, at numerous times defendant would "creep" on his stomach to the victim, throwing rocks to see if the victim was dead. According to eyewitness testimony, the victim was not dead. As defendant threw the rocks at his victim's body, the victim cried out in pain. As the victim lay incapacitated on the ground, he was aware of his impending death, but unable to change the outcome. Defendant's throwing of the rocks and the corresponding groaning by the victim demonstrate the unnecessary torture inflicted by defendant. When viewing the evidence in the light most favorable to the State, we cannot say there was insufficient evidence to support the jury's consideration of HAC. Defendant's assignment of error is overruled.

[8] Defendant argues the prosecution presented insufficient evidence to submit the (e)(6) pecuniary gain aggravating circumstance to the jury. N.C.G.S. § 15A-2000(e)(6) (2005). As with the (e)(9) circumstance discussed above, in determining whether there was sufficient evidence for submission of the pecuniary gain aggravating circumstance, we consider " 'the evidence . . . in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom.' " *State v. White*, 355 N.C. 696, 710, 565 S.E.2d 55, 64 (2002) (quoting *State v. Moore*, 335 N.C. 567, 611, 440 S.E.2d 797, 822, *cert. denied*, 513 U.S. 898 (1994)), *cert. denied*, 537 U.S. 1163 (2003). If there is substantial evidence defendant's motive in the killing was the gain of something of pecuniary value, although not necessarily his only or primary motive, the circumstance is properly submitted. *See id.; see also State v. Bell*, 359 N.C. at 32, 603 S.E.2d at 114.

Here, the evidence tended to show that defendant, after murdering his victim, stole the victim's truck, directed his girlfriend to return to the victim's residence to take the victim's wallet, directed use of the victim's ATM card to obtain cash primarily for drug purchases, and then sold the victim's truck to finance his escape to Colorado. Defendant argues because he did not take the nearly $2,000 the victim had in his possession, the murder could not have been for

pecuniary gain. However, considering the victim had a firearm, which he tried to fire at least once, and, according to eyewitness testimony, was still conscious, the jury could have reasonably believed defendant did not take the money because of fear of his victim. We find submission of the pecuniary gain circumstance was supported by substantial evidence, and therefore overrule defendant's assignment of error.

[9] Defendant also argues submission of the pecuniary gain aggravating circumstance violated the bar against double jeopardy because the jury did not find defendant guilty under the felony murder rule, and both the felony murder allegation and pecuniary gain aggravator were based on the same evidence. Thus, according to defendant, as the jury did not return a verdict of guilty on a theory of felony murder, the trial court was prohibited from submitting pecuniary gain as an aggravating circumstance. We note at the outset defendant did not make this argument at trial and as a general rule this Court will not consider constitutional arguments raised for the first time on appeal. *See State v. Benson*, 323 N.C. at 322, 372 S.E.2d at 519. However, even if defendant had properly preserved this argument, it is without merit.

Defendant's theory that the jury's silence is tantamount to an acquittal is not supported by the jurisprudence of this Court. Contrary to the instructions given it by the trial court, the jury did not mark anything on the verdict form concerning felony murder under either a robbery with a dangerous weapon or attempted robbery with a dangerous weapon theory; however, the jury did find defendant guilty of first-degree murder on a theory of malice, premeditation, and deliberation. We have held numerous times that the jury's failure to follow the instructions of the trial court does not amount to an acquittal when the defendant was also convicted of first-degree murder on another theory. *See State v. Guevara*, 349 N.C. 243, 259, 506 S.E.2d 711, 721-22 (1998), *cert. denied*, 526 U.S. 1133 (1999); *State v. McCollum*, 334 N.C. 208, 220-22, 433 S.E.2d 144, 150-51 (1993), *cert. denied*, 512 U.S. 1254 (1994). While in some circumstances jury silence can be taken as an acquittal for double jeopardy purposes, "[t]he failure to return a verdict does not have collateral estoppel effect, however, unless the record establishes that the issue was actually and necessarily decided in the defendant's favor." *Schiro v. Farley*, 510 U.S. 222, 236 (1994). The record in this case does not establish the jury actually and necessarily decided this issue in defendant's favor. In fact the record shows defendant "was convicted

of first-degree murder and has not been acquitted of anything."
*McCollum*, 334 N.C. at 221, 433 S.E.2d at 151. Therefore, we overrule
defendant's assignment of error.

**[10]** Defendant argues the trial court committed reversible error
when it instructed the jury: "Our law identifies the aggravating cir-
cumstances which must justify a sentence of death. Or which might
justify a sentence of death." Citing several cases in support of his
argument, defendant contends this assignment of error was properly
preserved as the trial court gave an instruction which was not agreed
upon by the parties. *See State v. Keel*, 333 N.C. 52, 56-57, 423 S.E.2d
458, 461 (1992); *State v. Montgomery*, 331 N.C. 559, 570, 417 S.E.2d
742, 748 (1992); *State v. Ross*, 322 N.C. 261, 264-65, 367 S.E.2d 889,
891 (1988); *State v. Pakulski*, 319 N.C. 562, 574-75, 356 S.E.2d 319, 327
(1987). In *Keel*, the trial court added language to a first-degree mur-
der instruction from a footnote to the pattern jury instructions which
concerned the intent required to convict a defendant of second-
degree murder or voluntary manslaughter. *See Keel*, 333 N.C. at
56-57, 423 S.E.2d at 461-62. In *Montgomery*, the trial court deviated
completely from the tendered instruction. 331 N.C. at 570-73, 417
S.E.2d at 748-50. In *Ross* and *Pakulski*, the trial court did not give
the agreed-upon instruction, omitting it entirely. *See Ross*, 322 N.C.
at 263-65, 367 S.E.2d at 890-91; *Pakulski*, 319 N.C. at 574-75, 356
S.E.2d at 327.

While the instruction given by the trial court here did not deviate
from the agreed upon instruction to the extent of the cases cited
above, the issue of the trial court's deviation was still properly pre-
served by defendant. Even so, when the jury charge is considered as
a whole, no prejudice to defendant occurred by the trial court's
quickly corrected slip of the tongue. While the original statement by
the trial court indicated that death was mandated upon the finding of
certain aggravating circumstances, the trial court quickly corrected
the charge by stating, "[o]r which might justify a sentence of death."
The trial court later instructed the jury it must weigh the aggravating
circumstances found against the mitigating circumstances found,
that it must consider whether the aggravating circumstances are "suf-
ficiently substantial to call for the imposition of the death penalty,"
and that it was to do so considering the aggravating circumstances
"in connection with any mitigating circumstances found by one or
more of you." There is absolutely no merit in the argument that the
jury could have been confused or believed it would be required to
recommend a sentence of death based solely upon the finding of an

aggravating circumstance. This *lapsus linguae* of the trial court did not prejudice defendant, and therefore defendant's assignment of error is overruled.

## RESIDUAL DOUBT

[11] Defendant asserts the trial court erred in denying his request to have a residual doubt instruction submitted to the jury. We have previously considered this issue and held a trial court is not required to give an instruction to a sentencing jury concerning residual doubt. *See State v. Fletcher*, 354 N.C. 455, 469-75, 555 S.E.2d 534, 543-46 (2001), *cert. denied*, 537 U.S. 846 (2002). As the Supreme Court of the United States recently noted, one justification for such a rule is that "sentencing traditionally concerns *how*, not *whether*, a defendant committed the crime." *Oregon v. Guzek*, 546 U.S. ——, 2006 U.S. LEXIS 1818, at *17 (2006) (holding the State of Oregon was not constitutionally required to allow a defendant to submit new alibi evidence during a penalty proceeding).

The Supreme Court of the United States has also rejected the argument that a defendant is entitled to jury instruction on residual doubt. *See Franklin v. Lynaugh*, 487 U.S. 164 (1988) (plurality); *see also id.* at 187-88 (O'Connor, J., concurring). Even though defendant has cited two Supreme Court cases, *Florida v. Nixon* and *Wiggins v. Smith*, which he claims have implicitly overruled *Franklin*, we disagree, because in neither case was residual doubt the issue before the Court. *See Florida v. Nixon*, 543 U.S. 175, 178 (2004) ("This capital case concerns defense counsel's strategic decision to concede, at the guilt phase of the trial, the defendant's commission of murder, and to concentrate the defense on establishing, at the penalty phase, cause for sparing the defendant's life."); *Wiggins v. Smith*, 539 U.S. at 514 ("Petitioner . . . argues that his attorneys' failure to investigate his background and present mitigating evidence of his unfortunate life history at his capital sentencing proceedings violated his Sixth Amendment right to counsel."). We therefore overrule defendant's assignment of error.

## INEFFECTIVE ASSISTANCE OF COUNSEL

[12] Defendant argues his counsel's representation was ineffective and deprived him of his Sixth Amendment right to counsel, along with rights guaranteed under the North Carolina Constitution. Defendant asserts his counsel was ineffective by: (1) Failing to elicit from the witness who discovered the victim's body that his driving of

a four-wheel all-terrain vehicle could have altered the position of the rocks at the crime scene; (2) failing to object during the prosecution's guilt and penalty phase closing arguments; and (3) failing to take appropriate steps when prosecutors allegedly elicited and relied on false evidence.

To prevail on a claim of ineffective assistance of counsel, a defendant must first show that his counsel's performance was deficient and then that counsel's deficient performance prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see also State v. Poindexter,* 359 N.C. 287, 290-91, 608 S.E.2d 761, 764 (2005). Deficient performance may be established by showing that "counsel's representation 'fell below an objective standard of reasonableness.' " *Wiggins v. Smith,* 539 U.S. 510, 521 (2003) (quoting *Strickland,* 466 U.S. at 688). Generally, "to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* at 534 (quoting *Strickland,* 466 U.S. at 694).

Under *State v. Fair,* 354 N.C. 131, 166-67, 557 S.E.2d 500, 524-25 (2001), *cert. denied,* 535 U.S. 1114 (2002), a defendant must raise ineffective assistance of counsel claims when those claims are apparent on the face of the record. However, when it appears to the appellate court further development of the facts would be required before application of the *Strickland* test, the proper course is for the Court to dismiss the defendant's assignments of error without prejudice. *See State v. Long,* 354 N.C. 534, 539-40, 557 S.E.2d 89, 93 (2001). Here, we believe further factual inquiry is required into these allegations of ineffective assistance of counsel. Therefore, we dismiss defendant's assignments of error without prejudice.

## PRESERVATION ISSUES

**[13]** Defendant contends his short-form indictment was insufficient because it failed to allege all the elements of first-degree murder. We disagree. We have consistently ruled short-form indictments for first-degree murder are permissible under N.C.G.S. § 15-144 (2005) and the North Carolina and United States Constitutions. *See State v. Mitchell,* 353 N.C. 309, 328-29, 543 S.E.2d 830, 842, *cert. denied,* 534 U.S. 1000 (2001); *State v. Davis,* 353 N.C. 1, 44-45, 539 S.E.2d 243, 271 (2000), *cert. denied,* 534 U.S. 839 (2001); *State v. Braxton,* 352 N.C. 158,

173-75, 531 S.E.2d 428, 436-38 (2000), *cert. denied*, 531 U.S. 1130 (2001); *State v. Wallace*, 351 N.C. 481, 504-08, 528 S.E.2d 326, 341-43, *cert. denied*, 531 U.S. 1018 (2000). We see no compelling reason to depart from our prior precedent on this issue. Here the indictment read: "The jurors for the State upon their oath present that on or about the 8th day of July, 1999, and in the county named above the defendant named above unlawfully, willfully and feloniously and of malice aforethought did kill and murder Christopher Conrad Gailey. Offense in violation of G.S. 14-17." As this indictment meets the requirements of N.C.G.S. § 15-144, we overrule defendant's assignment of error.

**[14]** Additionally, defendant argues the trial court lacked jurisdiction to enter a death sentence because the indictment did not list the aggravating circumstances to be proven by the State during the penalty phase. This Court has rejected this argument in the past. *See State v. Hunt*, 357 N.C. 257, 268-78, 582 S.E.2d 593, 600-07, *cert. denied*, 539 U.S. 985 (2003). We see no reason to depart from our holding in *Hunt* and therefore overrule defendant's assignment of error.

**[15]** Defendant argues the jury instruction regarding the especially heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad and cannot, consistent with *Ring v. Arizona*, 536 U.S. 584 (2002), be cured by appellate narrowing. We recently discussed this issue at length in *State v. Duke*, 360 N.C. 110, 623 S.E.2d 11 (2005), and found the argument to lack merit. We are not inclined to change our recently decided precedent and therefore overrule defendant's assignment of error.

**[16]** Defendant argues the trial court erred in instructing the jury on the burden of proof required to find a mitigating circumstance by using the word "satisfied" instead of the more detailed instruction proposed by defendant. Defendant claims the term "satisfy" is subjective in nature, is vague, and means something beyond a preponderance of the evidence. We disagree. The term "satisfy" does not create this standardless standard defendant claims. *See State v. Payne*, 337 N.C. 505, 531-33, 448 S.E.2d 93, 108-09 (1994), *cert. denied*, 514 U.S. 1038 (1995). " '[S]atisfies' denotes a burden of proof consistent with a preponderance of the evidence." *Id.* at 533, 448 S.E.2d at 109; *see also State v. Bell*, 359 N.C. at 46, 603 S.E.2d at 122 (treating issue as preservation issue). We overrule defendant's assignment of error.

STATE v. ALLEN

[360 N.C. 297 (2006)]

**[17]** Defendant contends the death penalty violates international law as it runs afoul of Article VII of the International Covenant on Civil and Political Rights (ICCPR) as that treaty prohibits the arbitrary deprivation of life. Defendant specifically argues that the length of time and the conditions under which defendant can expect to be detained while appealing his conviction and sentence violate the ICCPR. *See* International Covenant on Civil and Political Rights, art. VII, Dec. 16, 1966, S. Treaty Doc. No. 95-2, 999 U.N.T.S. 171. This Court has considered this argument in the past and rejected it.

> [W]e cannot see how any defendant's right to appeal errors alleged in his capital case, which necessarily delays his execution, or our own mandate to ascertain on appeal that the death penalty rests firmly on the law and is in no way arbitrary or in any other way "cruel or degrading" violates this treaty's provisions.

*State v. Smith*, 352 N.C. 531, 566, 532 S.E.2d 773, 795 (2000), *cert. denied*, 532 U.S. 949 (2001). Article VII of the ICCPR condemns torture, and we do not believe it is torturous to allow defendant to appeal his conviction and sentence. It is a basic tenant of our jurisprudence that a defendant has the right to exhaust all legal remedies, but nothing requires him to do so if he knowingly and intelligently decides to forgo those opportunities. *See, e.g.*, Matthew Eisley, *Killer Had Asked for Execution*, News & Observer (Raleigh, N.C.), 22 October 2004, at B1 (detailing Charles Wesley Roache's decision to forgo additional review of his first-degree murder conviction and sentence of death). We simply cannot find a violation of defendant's rights merely because he chooses to subject himself to the rigors of judicial review. Additionally, the United States deposited a reservation to the ICCPR stating, "[t]he United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment . . . ." S. Rep. No. 103-35, at 8 (1993). We decline to overrule our prior law on this issue. Defendant's assignment of error is overruled.

## PROPORTIONALITY

**[18]** Pursuant to N.C.G.S. § 15A-2000(d)(2), this Court has the statutory duty to determine if:

> [T]he record does not support the jury's findings of any aggravating circumstance or circumstances upon which the sentencing

court based its sentence of death . . . [whether] the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, or . . . [whether] the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

N.C.G.S. § 15A-2000(d)(2) (2005).

The jury found the statutory aggravating circumstances of: (1) The murder was committed for the purpose of avoiding or preventing a lawful arrest, (e)(4); (2) defendant committed the murder for pecuniary gain, (e)(6); and (3) the murder was especially heinous, atrocious, or cruel, (e)(9). The trial court also submitted the N.C.G.S. § 15A-2000(f)(6) mitigating circumstance[3] which the jury did not find, along with thirteen nonstatutory mitigating circumstances of which the jury found two: (1) Defendant was deeply affected by the death of his grandfather, and (2) defendant's death would have a detrimental impact on his mother, father, daughter, and other family members.[4]

After a thorough review of the record, transcripts, briefs, and oral arguments on appeal, we conclude the jury's finding of the three aggravating circumstances is supported by the evidence. Additionally, we conclude nothing in the record, transcripts, briefs, or oral arguments suggests the sentence given defendant was imposed under the influence of passion, prejudice, or any other arbitrary factor. We will not disturb the jury's weighing of the mitigating and aggravating circumstances.

Finally, we must determine whether capital punishment is proportionate in this case. The decision whether the death sentence is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. 142, 198, 443 S.E.2d 14, 47 (citation omitted), *cert. denied*, 513 U.S. 1046 (1994). Proportionality review is intended to " 'eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *State v. Smith*, 357 N.C. 604, 621, 588 S.E.2d 453, 464 (2003) (citation omitted), *cert. denied*, 542 U.S. 941 (2004); *see also State v. McNeill*, 360 N.C. 231, 624 S.E.2d at 344.

---

3. "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired." N.C.G.S. § 15A-2000(f)(6) (2005).

4. Additionally the (f)(9) "catchall" mitigating circumstance was submitted to the jury but was not found to exist.

STATE v. ALLEN

[360 N.C. 297 (2006)]

In our proportionality review, we compare the case at bar to cases in which this Court has found imposition of the death penalty to be disproportionate. This Court previously determined capital punishment was disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 573 S.E.2d 870 (2002); *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 483 S.E.2d 396, *cert. denied*, 522 U.S. 900 (1997), *and by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); and *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

In no case in which we found capital punishment disproportionate did the jury find the three aggravating circumstances the jury found in defendant's case. In fact, when the jury has found as an aggravating circumstance the murder was especially heinous, atrocious, or cruel, we have only found the death sentence disproportionate twice. *See State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). *Stokes* and *Bondurant* are easily distinguishable from this case. In *Stokes*, the defendant was only seventeen years old at the time of the killing, and the only one of four assailants to receive capital punishment as a sentence. 319 N.C. at 3-4, 21, 352 S.E.2d at 654-55, 664. In *Bondurant*, the defendant expressed remorse immediately after the murder and even aided the victim in traveling for treatment by directing the victim's transport to the hospital. 309 N.C. at 694, 309 S.E.2d at 182-83. However, in this case defendant is the sole defendant; he alone committed this murder. Additionally, defendant was twenty-six years old at the time he brutally murdered his victim. Moreover, defendant did not show the type of remorse present in *Bondurant*; instead defendant threw rocks at his victim's body to make sure he was dead and then left the body in the woods. In fact, defendant has shown no remorse at all for his actions.

"Although we 'compare this case with the cases in which we have found the death penalty to be proportionate . . . . we will not undertake to discuss or cite all of those cases each time we carry out that duty.' " *State v. Garcia*, 358 N.C. 382, 429, 597 S.E.2d 724, 756 (2004) (quoting *State v. McCollum*, 334 N.C. at 244, 433 S.E.2d at 164) *cert. denied*, 543 U.S. 1156 (2005). The imposition of death for this murder is proportionate when compared with our other cases. Therefore, we

**STEIN v. ASHEVILLE CITY BD. OF EDUC.**

[360 N.C. 321 (2006)]

hold defendant's sentence is neither disproportionate nor excessive considering the nature of defendant and the crime he committed.

Defendant received a fair trial free of reversible error in both the guilt-innocence proceeding and the penalty proceeding. Defendant's sentence of death is not disproportionate. Accordingly, we find no error.

NO ERROR.

Justice TIMMONS-GOODSON did not participate in the consideration or decision of this case.