IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-199

Filed 21 January 2026

Alamance County, Nos. 21CR054618-000, 21CR054619-000, 22CR000547-000

STATE OF NORTH CAROLINA

v.

EMILY JEAN ROBINSON, Defendant.

Appeal by Defendant from judgment entered 28 May 2024 by Judge Edwin Wilson in Alamance County Superior Court. Heard in the Court of Appeals 21 October 2025.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Zachary K. Dunn, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Amanda S. Zimmer, for Defendant.*

GRIFFIN, Judge.

Defendant Emily Jean Robinson appeals from judgment entered after a jury found her guilty of possession with intent to sell or deliver a controlled substance (fentanyl), maintaining a dwelling to keep controlled substance, and possession of drug paraphernalia. Defendant argues (1) the trial court erred by denying her right to open and close the arguments, (2) the trial court erred by allowing an expert to testify about toxicology results, (3) the trial court erred by allowing sentencing for both death by distribution and sale of a controlled substance, and (4) she received

ineffective assistance of counsel. We hold the trial court did not prejudicially err.

## I.   Factual and Procedural Background

On 14 September 2021, Robert Starner told his friend, Adlai Walters, "he wanted to get . . . some 'boy.'" Walters understood "boy" to mean heroin, and, thus, tried to dissuade Starner from getting it. Starner ignored his friend's advice and called Defendant. Then, Starner, Walters, and Starner's girlfriend, Kora Bott, drove about thirty minutes to a residential house to obtain drugs. Starner went around to the back door of the house and Defendant opened it. After a few minutes of chatting with Defendant, Starner returned to the vehicle. Once inside the car, Starner snorted a small amount of a drug from his hands and Bott also partook in some of the drugs. Starner offered Walters some of the drugs, but Walters turned him down.

Shortly after snorting drugs, Starner began driving away from the house. However, once on the road, Starner started to drive erratically, going too fast and talking "crazy." Walters then told Starner to stop the car and Walters replaced Starner as the driver. As Walters drove, Starner and Bott were both moaning and making a lot of noise. Neither Starner nor Bott responded to Walters' request for directions back to Bott's apartment, so Walters drove back to town instead and ended up at Starner's parents' house.

When he arrived at the house, Walters thought Starner and Bott were just sleeping off the drugs, so he parked the car, took the keys, and went inside the home, where he told Starner's mother that Starner and Bott were inside the car on drugs.

Walters left the keys inside to prevent Starner and Bott from attempting to drive in their current state, checked on the couple one last time, went back inside to tell Starner's parents he was going to stay with an old girlfriend that night, and then went to his old girlfriend's house. When Walters last checked on Starner and Bott, they were still squirming and making noises.

At about 12:30 a.m. on 15 September 2021, Burlington Police Department Officer Bralin Haith responded to a possible overdose call at Starner's parents' home and found Starner and Bott in the car in the driveway. Officer Haith secured a bag containing some substance from the back seat and placed it in an evidence envelope; he also found loose pills in the vehicle but refrained from seizing them.

When police and medical services arrived, Bott had difficulty breathing, but ultimately survived. Starner was not responding, so Emergency Medical Services ("EMS") tried to revive him. However, EMS was unable to revive him and Starner died at the scene. Walters learned Starner died and returned to the scene, where he told the police about the prior night's events. Later, Walters rode with the police to try to locate the residence where the group had purchased the drugs. The police and Walters successfully located the house on the second trip.

On 16 September 2021, officers spoke with Defendant at her friend's house and searched her bag to discover she possessed a substance they suspected was fentanyl. Then, Defendant voluntarily went to the police station for an interview. During the interview, she initially denied using or selling fentanyl, but later admitted she used

and sold fentanyl and specifically sold to Starner and Bott. The police executed a search warrant of Defendant's home and found off-white powder in various locations, suspected Xanax, digital scales, corner baggies, and bindles. Additionally, text messages showed Defendant had communicated with both Starner and Bott dating back to June 2021.

Dr. Michelle Aurelius, Chief Medical Examiner at the North Carolina Office of the Chief Medical Examiner and expert in pathology and forensic pathology, began assessing Starner's body on 15 September 2021. Dr. Aurelius refrained from conducting a full autopsy examination on Starner's body, but took samples of Starner's urine, which tested positive for methamphetamine, cocaine, fentanyl, amphetamine, and THC. Dr. Aurelius then submitted the urine samples to the toxicology laboratory for examination. Dr. Aurelius made a findings report that was admitted into evidence at trial.

Dr. Justin Brower, forensic toxicologist and expert in forensic toxicology, approved Starner's toxicology report, performed by other forensic chemists using liquid chromatography. Dr. Brower testified his job is to analyze the results of such forensic chemists and evaluate the data for completeness and accuracy. Dr. Brower additionally testified, in his expert opinion, the test results from the toxicology report indicated Starner had used methamphetamine, cocaine, and fentanyl prior to his death. Furthermore, Dr. Brower opined Starner likely ingested such drugs within

twenty-four hours of his death and reasoned 9.5 nanograms per milliliter, the amount of fentanyl in Starner's body, was sufficiently fatal.

At trial, the State delivered the first opening and closing arguments and Defendant followed both times. Defendant objected and asserted that, because the defense did not put on evidence, it was error to not allow the defense to open and close the closing arguments, under Rule 10 of the North Carolina Rules of Superior and District Courts. However, the trial court responded to this objection stating it had discretion to allow the State to have the first closing argument. Defendant then moved for a mistrial using the same argument, but the trial court determined any potential error was not substantial or irreparable prejudice to Defendant.

At the close of the trial, the jury found Defendant guilty of all charges. The trial court entered a single consolidated sentence for all of Defendant's offenses and sentenced her to a term of sixty to eighty-four months imprisonment. Defendant timely appeals.

## II.    Analysis

### A. Opening and Closing Arguments

Defendant argues the trial court erred in failing to allow Defendant the opportunity to both open and close the jury arguments and denying her motion for mistrial. "This Court reviews a trial court's denial of a motion for mistrial under an abuse of discretion standard." *State v. McDougald*, 279 N.C. App. 25, 27, 862 S.E.2d 877, 880 (2021) (citation omitted).

Rule 10 of the General Rules of Practice for the Superior and District Courts of North Carolina states in part:

> In all cases, civil or criminal, if no evidence is introduced by the defendant, the right to open and close the argument to the jury shall belong to him. If a question arises as to whether the plaintiff or the defendant has the final argument to the jury, the court shall decide who is so entitled, and its decision shall be final.

N.C. Super. and Dist. Ct. R. 10. A defendant has the right to have his or her counsel at least conclude the jury argument. *State v. Raper*, 203 N.C. 489, 491, 166 S.E. 314, 315 (1932). However, there may be exceptions to this rule. *See State Tr. Co. v. Braznell¸* 227 N.C. 211, 215, 41 S.E.2d 744, 747 (1947) (holding the right to the concluding argument was not infringed upon where one of the two defendants delivered the closing argument prior to the other defendant); *see State v. Lee*, 277 N.C. 205, 209, 176 S.E.2d 765, 767 (1970) (citation omitted) (explaining a codefendant's introduction of evidence waives the other defendant's right to closing argument).

When a trial court refused to permit all of a defendant's counsel to address the jury during final argument, our Supreme Court held prejudicial error per se. *State v. Mitchell*, 321 N.C. 650, 659, 365 S.E.2d 554, 559 (1988). However, appellate courts generally refrain from finding prejudicial error per se. *State v. Malachi*, 371 N.C. 719, 735, 821 S.E.2d 407, 419 (2018). Normally, a defendant must demonstrate prejudice, in addition to statutory error, before receiving a new trial. *State v. Griffin,*

298 N.C. App. 85, 91–92, 914 S.E.2d 8, 12–13 (2025) (citation omitted). The burden is on the defendant to show prejudice by presenting a reasonable possibility of a different verdict had the error not been committed. N.C. Gen. Stat. § 15A-1443(a); *State v. Conner*, 335 N.C. 618, 630, 440 S.E.2d 826, 833 (1994) (citation omitted).

The test as to whether a defendant "introduced," or put an object into, evidence is whether a party offered the object as substantive evidence such that a jury may examine it and evaluate whether the object bolsters or undermines a witness's testimony. *State v. English*, 194 N.C. App. 314, 318, 669 S.E.2d 869, 871 (2008) (citation omitted). Conversely, a party that presents an object to a witness to refresh his or her recollection has not introduced evidence. *Id.*

Generally, testimony elicited from a witness during cross-examination is deemed as coming from the party who calls the witness, despite the reality that cross-examination tends to support the cross-examiner's case. *State v. Matthews*, 218 N.C. App. 277, 279, 720 S.E.2d 829, 831 (2012) (citation omitted). Yet, evidence may still be "introduced," under its meaning within Rule 10, during cross-examination when (1) an object is offered into evidence and accepted as such by the trial court, or (2) a new irrelevant matter is presented to the jury. *Id.* at 279, 720 S.E.2d at 832 (citation omitted). Accordingly, new relevant matters raised during a cross-examination do not amount to evidentiary "introduction." *State v. Shuler*, 135 N.C. App. 449, 453, 520 S.E.2d 585, 588 (1999) (citation omitted). Otherwise, a defendant would have an intolerable burden of either refraining from the "constitutional right to cross-examine

and thereby suffer adverse testimony to stand in the record unchallenged and unimpeached or forfeit the valuable procedural right to [open and close] closing argument." *Id.* at 453, 520 S.E.2d 588–89 (cleaned up).

Another consideration in determining whether an object was introduced is whether the object was the witness's own; for instance, a witness reading aloud her own report will likely not constitute an introduction of evidence. *State v. Hennis*, 184 N.C. App 536, 539, 646 S.E.2d 398, 400 (2007) (citation omitted); *State v. Wells*, 171 N.C. App. 136, 140, 613 S.E.2d 705, 707–08 (2005) (citation omitted). On the other hand, a witness reading aloud a report made by another person who did not testify will likely qualify as an evidentiary introduction. *State v. Macon*, 346 N.C. 109, 113–14, 484 S.E.2d 538, 540–41 (1997) (citation omitted).

Here, Defendant concluded the argument to the jury, but did not deliver the first argument. Therefore, Defendant's right to at least conclude the jury argument was protected. *Raper*, 203 N.C. at 489, 166 S.E. at 315. Still, we acknowledge Rule 10 gives Defendant the ability to both open and close the jury argument when he or she does not introduce evidence.

Assuming arguendo that Defendant did not introduce evidence within the meaning of Rule 10 and the trial court erred in denying her ability to both open and close the arguments to the jury, Defendant failed to show how the trial court's error prejudiced her. Unlike *Mitchell*, Defendant's sole counselor delivered the final argument to the jury. Given the distinction between *Mitchell* and our case at hand,

we refrain from holding prejudicial error per se. So, Defendant maintains the burden to demonstrate prejudice along with a Rule 10 statutory error. Defendant argued "she lost the ability to explain the law before the State argued" and lost the primacy effect in influencing the jury. However, Defendant inadequately explains that there was a reasonable possibility of a different verdict absent the error, especially in the face of the evidence mounted against her. Thus, we refrain from granting Defendant a new trial.

**B. Expert Testimony**

Defendant contends the trial court erred by allowing Dr. Brower to testify about the toxicology results because it allegedly violated the Confrontation Clause.

"This Court reviews alleged constitutional errors in the admission of testimony in violation of the Confrontation Clause de novo." *State v. Pabon*, 380 N.C. 241, 252, 867 S.E.2d 632, 640 (2022) (citation omitted). However, a defendant may waive issues on appeal if the issues are not raised at trial. *State v. Wiley*, 355 N.C. 592, 624, 565 S.E.2d 22, 44–45 (2002) (citations omitted). Defendant concedes she failed to raise this issue at trial and therefore waived appellate review. We agree Defendant waived this testimonial admission issue, but assuming it was properly preserved, we find no error.

The Confrontation Clause, as guaranteed by the Sixth Amendment of the United States Constitution, ensures a defendant has the right to confront the witnesses against him. U.S. Const. amend. VI. Thus, the Confrontation Clause bars

the admission of an absent witness' testimonial statements, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Smith v. Arizona*, 602 U.S. 779, 783 (2024) (quoting *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004)).

The Confrontation Clause applies in full force to forensic evidence. *Id.* at 783. However, in North Carolina, the Confrontation Clause does not apply to computer-generated data created by a machine without human judgment. *State v. Lester*, 387 N.C. 90, 98, 910 S.E.2d 642, 648 (2025) (citation omitted). Since machines are not people, they cannot be declarants, and therefore cannot offer testimonial statements, within the meaning of the Confrontation Clause. *Id.* at 98–99, 910 S.E.2d at 648–49 (citation omitted).

Specifically, toxicology data of liquid samples generated by lab machines, such as chromatographs, are not out-of-court "statements," within the meaning of the Confrontation Clause. *Id.* at 99, 910 S.E.2d at 649; *see U.S. v. Washington*, 498 F.3d 225, 229–30 (4th Cir. 2007). Thus, an expert's testimony regarding a toxicology report containing machine-generated data does not violate the Sixth Amendment of the U.S. Constitution. *Washington*, 498 F.3d at 230.

Here, we acknowledge Dr. Brower relied on drug test results produced by other forensic chemists. However, the forensic chemists did not use their judgments or independently opine on the quantity of each drug in Starner's system; rather a machine-produced chromatograph provided the data. The output of the drug

screening results, produced by liquid chromatography, is not an out-of-court statement barred by the Confrontation Clause. Furthermore, Dr. Brower analyzed all of the data himself and testified about the drugs in Starner's body based on the machine-generated data. Since Dr. Brower's testimony did not come from out-of-court statements made by forensic chemists, the trial court's allowance of Dr. Brower's testimony was not error.

**C. Sentencing Consolidation**

Defendant claims the trial court erred in sentencing her to both death by distribution and sale of a controlled substance, in alleged violation of her constitutional protection from multiple punishments for the same offense.

This Court reviews alleged constitutional rights violations de novo. *State v. Cromartie*, 257 N.C. App. 790, 795, 810 S.E.2d 766, 771 (2018) (citation omitted). However, an unpreserved constitutional question will not ordinarily be considered on appeal. *Id.* Here, Defendant concedes she failed to raise the issue of double jeopardy to the trial court. Although the issue is unpreserved on appeal, Defendant's argument would still fail, even assuming it was preserved properly.

When "one offense is a lesser-included offense of another, the two offenses are considered the same criminal offense." *State v. Schalow*, 251 N.C. App. 334, 352, 795 S.E.2d 567, 579 (2016) (citation omitted). The U.S. Constitution's Double Jeopardy Clause in part prohibits multiple punishments for the same offense, absent clear contrary legislative intent. *State v. Mulder*, 233 N.C. App. 82, 87, 755 S.E.2d 98, 102

(2014) (citation omitted). To analyze whether two offenses are actually one offense, we use the Blockburger Test, where we determine "whether each provision requires proof of a fact which the other does not" when the same factual circumstance constitutes violations for two separate statutory provisions. *Blockburger v. United States*, 284 U.S. 299, 304 (1932) (citations omitted). In other words, if the same conduct constitutes two offenses, each requiring proof of a unique fact, the Blockburger Test reveals the Double Jeopardy Clause is not violated. *United States v. Dixon*, 509 U.S. 688, 689 (1993). Nevertheless, "double jeopardy does not prohibit multiple punishment for offenses when one is included within the other under the *Blockburger* test if both are tried at the same time and if the legislature intended for both offenses to be separately punished." *State v. Gardner*, 315 N.C. 444, 454, 340 S.E.2d 701, 709 (1986).

To determine whether a crime is a lesser included offense of another offense, North Carolina courts use the definitions of each offense, as opposed to the facts. *State v. Nickerson*, 365 N.C. 279, 281, 715 S.E.2d 845, 847 (2011) (citation omitted). Accordingly, all essential elements of the lesser crime must also be essential elements of the greater crime. *Id.* at 281–82, 715 S.E.2d at 847. Yet, if "the lesser crime has an essential element which is not *completely* covered by the greater crime, it is *not* a lesser included offense." *Id.* at 282, 715 S.E.2d at 847 (citation modified).

At the applicable time, death by distribution of certain controlled substances had the following elements: (1) the "person unlawfully sells at least one certain

controlled substance;" (2) the "ingestion of the certain controlled substance or substances causes the death of the user;" (3) the "commission of the offense in subdivision (1) of this subsection was the proximate cause of the victim's death;" and (4) the "person did not act with malice." N.C. Gen. Stat. § 14-18.4(b) (2021). On the other hand, the sale and/or delivery of a controlled substance comprises a transfer of a controlled substance "by either sale or delivery, or both." *State v. Carr*, 145 N.C. App. 335, 341, 549 S.E.2d 897, 901 (2001) (citation omitted); *State v. Chevallier*, 264 N.C. App. 204, 211, 824 S.E.2d 440, 447 (2019) (citation omitted).

The defined "controlled substances" for death by distribution and sale and/or delivery of a controlled substance differ. Specifically, the alleged lesser included offense, sale and/or delivery of a controlled substance, includes "*a* controlled substance," which indicates any controlled substance. N.C. Gen. Stat. § 90-95 (2021) (emphasis added). The sale and/or delivery of a controlled substance statute contains multiple lists of controlled substances. *See* N.C. Gen. Stat. § 90-95; N.C. Gen. Stat. § 90-90 (2021); N.C. Gen. Stat. § 90-89 (2021); N.C. Gen. Stat. § 90-91 (2021); N.C. Gen. Stat. § 90-92 (2021); N.C. Gen. Stat. § 90-93 (2021); N.C. Gen. Stat. § 90-94 (2021). On the other hand, the alleged greater offense, death by distribution, features a limited list of certain controlled substances, which is a smaller subset of controlled substances in comparison to the sale and/or delivery of a controlled substance. N.C. Gen. Stat. § 14-18.4. Thus, this alleged lesser crime has an essential element which

is not completely covered by the greater crime; therefore, sale and/or delivery of a controlled substance is not a lesser included offense of death by distribution.

Furthermore, using North Carolina's definitional approach, the alleged greater offense is actually narrower in terms of Defendant's actions. For death by distribution a person is guilty if he or she unlawfully *sells* at least one certain controlled substance, in addition to satisfying the offense's other elements. Alternatively, the sale and/or delivery of a controlled substance broadens Defendant's possible guilty actions to include selling, delivering, or both.

The North Carolina session law enacting the death by distribution statute included a preamble that identified a few of the North Carolina General Assembly's reasons for passing this legislation. 2019 N.C. Sess. Laws 83. Section 14-18.4's preamble states the General Assembly's intent is to "strengthen the laws to act as a greater deterrent to persons who want to illegally distribute opioids and further exacerbate the opioid epidemic." *Id.* The General Assembly also expressed its concern about dramatic increases in opioid-related overdoses in the past twenty years and desire to limit opioid distribution to legitimate medical prescriptions. *Id.* Additionally, the General Assembly included its legislative intent within the statute itself stating it enacted "this law to encourage effective intervention by the criminal justice system to hold illegal drug dealers accountable for criminal conduct that results in death." N.C. Gen. Stat. § 14-18.4(a). This highlights the General Assembly's intent to particularly punish illegal drug dealing that *ends in the death of*

*the user*, which is a separate intent from punishing solely the sale and/or delivery of a controlled substance.

In consideration of the preamble sections explaining the statute's purpose as well as the express legislative intent within the statute itself, the General Assembly expressly indicates its legislative intent. The General Assembly highlights this new legislation is necessary in light of increased opioid-related overdoses specifically in the last two decades, illuminating a particular need to bolster the deterrent to those distributing opioids. These sentiments of the General Assembly signal death by distribution and sale of a controlled substance are offenses intended to be separately punishable. Therefore, the Double Jeopardy Clause is not violated. We hold the trial court did not err in sentencing Defendant for both death by distribution and sale of a controlled substance.

## D. Ineffective Assistance of Counsel

Defendant argues she received ineffective assistance of counsel because her counsel failed to object to (1) Dr. Brower's testimony and (2) convictions of both death by distribution and sale of a controlled substance.

Both federal and North Carolina law regard ineffective assistance of counsel claims in the same manner. *State v. Braswell*, 312 N.C. 553, 562–63, 324 S.E.2d 241, 248 (1985). A defendant must show (1) his or her counsel's performance at trial was deficient and (2) such deficiency prejudiced Defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Allen*, 360 N.C. 297, 316, 626 S.E.2d 271, 286 (2006).

Courts presume trial counsel's conduct was professionally acceptable. *Strickland*, 466 U.S. at 689–90; *State v. Roache*, 358 N.C. 243, 280, 595 S.E.2d 381, 406 (2004) (citation omitted).

When counsel errs such that he or she falls below an objective standard of reasonable professional conduct as to no longer constitute "counsel" as guaranteed by the U.S. Constitution, counsel's performance was deficient. *Strickland*, 466 U.S. at 687; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Allen*, 360 N.C. at 316, 626 S.E.2d at 286. To demonstrate counsel's deficient performance prejudiced a defendant, a defendant must show, but for counsel's errors, there is a substantial probability there would have been a different proceeding outcome. *Allen*, 360 N.C. at 316, 626 S.E.2d at 286; *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

Ineffective assistance of counsel "claims brought on direct review will be decided on the merits when the cold record reveals that no further investigation is required." *State v. Fair*, 354 N.C. 131, 166, 557 S.E.2d 500, 524 (2001). This Court must dismiss such a claim without prejudice if we determine it is prematurely brought. *State v. Thompson*, 359 N.C. 77, 122–23, 604 S.E.2d 850, 881 (2004).

Since we hold no error for both Dr. Brower's testimony and the sentencing of death by distribution and sale of a controlled substance, Defendant failed to show how counsel erred, let alone deficiently erred. Thus, Defendant's ineffective assistance of counsel claim fails.

### III.    Conclusion

Despite losing the ability to argue first and last, Defendant did not demonstrate how this prejudiced her. The trial court did not err in allowing expert testimony of machine generated data and in sentencing Defendant for both death by distribution and sale of a controlled substance. Lastly, Defendant did not receive ineffective assistance of counsel.

NO PREJUDICIAL ERROR.

Judges COLLINS and STADING concur.